[L. A. No. 23750. In Bank. Dec. 23, 1955.]

JESSIE SENERIS et al., Appellants, v. DR. GEORGE S. HAAS et al., Respondents.

Pollock & Pollock, Edward I. Pollock, David Pollock and William Jerome Pollock for Appellants.

Hirson & Horn, Theodore A. Horn, Edward M. Raskin, Samuel A. Rosenthal, Leonard G. Ratner, Boccardo, Blum & Lull, Ashe & Pinney, Richard L. Oliver, Ben C. Cohen, Lionel Campbell, Rose, Klein & Marias, Elmer Low, Marion P. Betty, Eugene E. Sax and Myron L. Garon as Amici Curiae on behalf of Appellants.

Hunter & Liljestrom, Harold J. Hunter, De Forrest Home, Reed & Kirtland and Henry E. Kappler for Respondents.

CARTER, J.—Plaintiffs, Jessie and Jesus Seneris, husband and wife, appeal from judgments of nonsuit entered in favor of all three defendants, Dr. George S. Haas, Dr. James S. West, and Methodist Hospital of Southern California, in an action for damages for malpractice.

On March 22, 1951, plaintiff Jessie Seneris, 37 years of age, and the mother of four children, was admitted to defendant

Methodist Hospital as a routine obstetrical case. Some nineteen hours after her admission, plaintiff was administered ether and other drugs which rendered her unconscious (618, 619, Pl. Ex. 1). The record shows that defendant hospital, through one of its nurses, selected defendant Dr. West, one of a panel of six anesthesiologists, to administer a spinal anesthetic to Mrs. Seneris. Within approximately 12 minutes after the anesthetic was administered (Pl. Ex. 1), plaintiff gave birth to a daughter. The delivery was spontaneous and uncomplicated. Plaintiff awakened the following morning and complained that ''she couldn't move her legs; that she had pain in her back, neck, head, arms and wrist.'' Plaintiff left the hospital five days after the birth of the baby, but returned for examination and X-rays. She was then given a back brace and crutches and later a leg brace. Within two or three months she regained the use of her right leg but at the time of the trial was still suffering pain in her left hip and had limited use only of her left leg.

Plaintiffs brought this action on the theory that Dr. West was negligent in administering the spinal anesthetic; that Dr. Haas, the obstetrician, was liable in that he knowingly permitted Dr. West to administer the spinal anesthetic; and against the hospital on the theory that it was liable under the doctrine of *respondeat superior*. Plaintiffs contend that all three defendants are liable under the doctrine of res ipsa loquitur; as joint venturers; and because they failed to call in a neurosurgeon and arrange for a laminectomy after discovering the paralysis.

Plaintiffs contend that the trial court committed error in granting nonsuits in favor of all three defendants in view of the evidence adduced; that error was committed in excluding the expert testimony of Dr. Webb, now deceased, offered by them in the field of anatomy, biology, pathology, histology and causation. (Dr. Webb's testimony was rejected on the ground that he did not qualify as an expert on the standard of care.) It is also contended that the doctrine of res ipsa loquitur is applicable under the facts here present. We are compelled to agree with these contentions.

## EVIDENCE

The following sketch is taken from Plaintiffs' Exhibit 5 and is set forth to illustrate the testimony of defendant doctors on which plaintiffs rely to show that the motions for nonsuit were improperly granted:

KEY: T—thoracic vertebra
L—lumbar vertebra
C—medullaris—conus medullaris

---

*It is plaintiffs' position that the needle with which the spinal anesthetic was administered was inserted between T-12 and L-1 (at a spot, it will be noted, where the spinal cord is still present); defendant West's position is that the anesthetic was administered between L-4 and L-5.

---

In contending that the spinal cord was injured, plaintiffs rely on a hospital record (Pl. Ex. 2) which contained the following written report made by Dr. Nathan E. Carl, defendant hospital's staff neurologist: "The patient's [Mrs. Seneris]

subjective complaints are seemingly warranted on the basis of the positive neurological findings. There is sensory loss, motor weakness and reflex change in the left leg, *indicating cord damage on the left in the lumbar region.* Patient's responses are constant and are not indicative of functional disorder." (Emphasis added.) Plaintiffs argue that had the spinal anesthetic been administered in the position contended for by defendant West, no damage to the *cord* (as distinguished from the nerves) could have resulted since the cord is not present in that position.

### Dr. Haas Testified as Follows

"Q. By Mr. Pollack [plaintiffs' counsel] : What is the next important thing to watch out for in the administration of a spinal anesthetic? A. The place or location of the administration.

"Q. Now, you are speaking of the various intervertebral interspaces that there are in the spine; is that correct? A. That is correct.

"Q. In connection with that, what is it that you have to watch out for with respect to where you insert the needle? A. In giving a spinal anesthetic, it is of utmost importance that you work in a region below the spinal cord itself. In administering a spinal anesthetic, a landmark on the posterior of the patient's body is determined by drawing an imaginary line between the crest of the ilium of the patient that is to receive the spinal anesthetic. Below this line it is perfectly safe to work.

"Q. And the reason for that, Doctor, is that the cord ends at the lower border of the first lumbar vertebra, usually? A. That is correct.

"Q. So, in inserting a needle into the spinal canal, the important thing to do is to make sure that you are below the end of the cord; is that right? A. That's right.

"Q. Why is it that you want to avoid the cord? A. The cord is a very delicate mechanism of the human body. It is an organ that we do not like to tamper with, one that is very, very sensitive. For that reason, it is naturally understandable that you would never work in that region where there is any possibility of working elsewhere.

"Q. So, if a needle, a spinal anesthetic needle, was being inserted into the spinal canal of a woman who was about to deliver a child, it would be bad practice, would it not, to go into a vertebral space above the first lumbar vertebra; is that correct? A. That is correct.

"Q. Now, next to [and above] the first lumbar vertebra, you have the 12th thoracic vertebra; is that correct? A. That's right.

"Q. Actually, in general practice, you never go in above the second lumbar vertebra; is that correct? A. Yes."

Dr. Haas also testified that when due care and proper practice was followed permanent paralysis did not follow. (100.) Dr. Haas' testimony also showed that Mrs. Seneris, having had one successful spinal anesthetic, was medically presumed to be non-allergic to such anesthesia. (101.)

### Dr. West Testified as Follows

"However, if we put in a solution which is heavier than the relative weight of the spinal fluid solution, the spinal fluid, if it is heavier than that, it will tend, by gravity alone, to go downward.

"Now, in this technique, one of the three items which is used in a solution of 10 per cent glucose, which increases the relative weight of the injected solution in relation to the spinal fluid, so that we are taking advantage of what we know to cause this solution to go down.

"Now, in addition to that, the table upon which the patient is located is placed in a slightly tilted position so that we take advantage not only of the fact that the solution is heavier than the spinal fluid into which it is placed, but we also by the position of the table take advantage of this heavier solution, so that, once the solution is put into the subarachnoid space, it goes down."

"Q. . . . Now, Doctor, ordinarily, when you are doing a spinal anesthetic, you like to insert the needle below this point here [indicating on Pl. Ex. 5] and I am pointing to the very tip of the conus medullaris; is that correct? A. Ordinarily, yes.

"Q. And the reason for that is that you want to run no risk of running into the cord proper; isn't that correct? A. It is a matter of some safety, yes. . . .

"Q. If you enter opposite L-2, for example, you are below the cord? A. Yes.

"Q. If you enter opposite L-1, the cord is there? A. The cord is still present, yes. . . .

"Q. All right. Let's go to, say, T-12. What do you say about if you enter the spinal canal in the interspace between L-1 and T-12. Would you point that out on the map [Pl.

Ex. 5], the interspace between lumbar one and thoracic 12? . . . A. Into this space (indicating).

"Q. Now, is there any danger there of coming in contact with the spinal cord? A. Yes.

"Q. Isn't it for that reason that whenever you insert a needle in the spinal canal you try to stay below L-1? A. Yes.

"Q. Why is it that you do not want to strike the cord with your needle? A. Well, for the same reason that I have no desire to strike any nerve with a needle, specifically.

"Q. What is that reason? A. It may damage the nerve."

In answer to the question: "Would trauma to the cord cause paralysis?" Dr. West answered "Yes." In answer to the question: "Trauma to the cord or to the nerve roots below the conus medullaris would cause paralysis, would it not?" Dr. West answered: "It is impossible to cause trauma to the cord below the conus medullaris." Dr. West testified as follows concerning his customary procedure in giving a spinal anesthetic: That when he first went into the delivery room, he told the nurse to turn the patient over on her right side; that he then opened his anesthetic tray; that he then put on sterile gloves; that there were four ampules of drugs on his tray—one of procaine, one of pontocaine solution, one of glucose solution, and one of ephedrine solution; that he opened three of the ampules with a file across the narrow neck of each; that he then drew a solution from each of three ampules into a syringe; that he then drew a solution from the fourth ampule into a smaller syringe; that he next applied a sterile solution to the patient's back; that he then placed a sterile drape sheet over the area just painted with the sterile solution; that "I then palpate the bony prominences for my landmarks"; that "I place my left hand on the patient's upper iliac crest [upper border of the hipbone]. . . . Then I drop my hand from this palpated bony crest into the midline of the back. . . . I [then] find that at this particular point my thumb is either in contact with the spinous process of lumbar 4 or has actually fallen into the interspace between lumbar 4 and 5. . . . At the space that I have located, keeping my thumb in the interspace, I raise a skin wheal. . . . The purpose of that is to alleviate any discomfort on the part of the patient when the subsequent injection is made. . . . My skin wheal is now made. With my thumb still on this interspace, I pick up my spinal needle and make my approach to the dura." Dr. West then testified that the needle was hollow, that it had a stilet in it to keep it closed; that after the

subarachnoid space had been entered, the stilet was withdrawn; that then the syringe was attached to the needle; that then the "free flow of spinal fluid" from the needle was observed; that he "then pick[ed] up my syringe, which has at this moment a total volume of 3 cc's in it. I dispose of 2 cc's of the fluid" leaving 1 cc of volume in the syringe; that he then "attach[ed] it to the hub of the needle and withdraw [sic] 1 cc of spinal fluid into the syringe; that the syringe is then swirled to mix it, and the drug with spinal fluid in it is injected into the canal"; that the needle was then withdrawn and the anesthetic finished.

 "A motion for nonsuit may properly be granted '. . . when, and only when, *disregarding conflicting evidence,* and giving to plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff.' (*Card* v. *Boms,* 210 Cal. 200, 202 [291 P. 190]; see also *Blumberg* v. *M. & T. Inc.,* 34 Cal.2d 226, 229 [209 P.2d 1]; *Golceff* v. *Sugarman,* 36 Cal.2d 152, 153 [222 P.2d 665].) 'Unless it can be said as a matter of law, that . . . no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury.' (*Estate of Lances,* 216 Cal. 397, 400 [14 P.2d 768]; see also *Raber* v. *Tumin,* 36 Cal.2d 654, 656 [226 P.2d 574].)" (Emphasis added; *Palmquist* v. *Mercer,* 43 Cal.2d 92, 95 [272 P.2d 26]; *Warner* v. *Santa Catalina Island Co.,* 44 Cal.2d 310 [282 P.2d 12].)

### SUMMARY

A summary of plaintiffs' evidence shows that Mrs. Seneris entered the hospital in good health and suffering from none of the complaints and difficulties with which she awakened the day following the administration of the spinal anesthetic; that she had previously had a spinal anesthetic from which she suffered no ill effects and so was presumed, medically speaking, to be nonallergic thereto; that she had no disease or condition which might have caused paralysis following a spinal anesthetic. The record also shows that defendant Haas testified that the place in the spine where the anesthetic

was to be administered was an "important thing" and of "utmost importance"; that it was "safe to work" below the end of the spinal cord; that it was "bad practice" to go into the spinal canal above the first lumbar vertebra; that the insertion of a needle above the first lumbar vertebra could cause cord damage; that in general practice a doctor never went in above the second lumbar vertebra. Dr. West testified that trauma to the cord would cause paralysis; that it would be "impossible to cause trauma to the cord below the conus medullaris"; that it was his opinion that plaintiff's (spinal) nerve roots had been affected by the anesthetic solution used by him. Plaintiffs introduced in evidence hospital records which showed that Dr. West arrived in the hospital delivery room at 9 p. m. and that two minutes later, at 9:02 p. m., the spinal anesthetic was completely administered. Dr. West's testimony shows the various steps, in chronological order, taken in administering such an anesthetic. Plaintiffs showed that Dr. West did not wash his hands prior to administering the anesthetic to Mrs. Seneris. Plaintiffs introduced in evidence the written report of Dr. Nathan E. Carl, defendant hospital's staff neurologist, wherein he stated that Mrs. Seneris' condition "indicat[ed] *cord damage* on the left in the lumbar region." (Emphasis added.)

Plaintiffs contend that evidence shows that the spinal anesthetic was hurriedly and negligently administered and that it was the proximate cause of Mrs. Seneris' injuries. Defendant West contends that there is nothing* in the record to show that plaintiff wife's injuries were caused by the anesthetic. This contention is disproved by the testimony of Dr. Haas himself when he testified: "Q. BY MR. POLLACK: Doctor, I want to know, in the case of Mrs. Seneris, what is your opinion as to the level of the nerve roots, this damage or injury to the—well, it is all mixed up. Let me try it once more. What I am trying to get at is this: *The nerve roots* (to be distinguished from the spinal cord) *have been affected, you say, by the anesthetic solution that you used; is that correct?*

"A. I think so. It is my opinion, yes." (Emphasis added.)

Dr. West later testified that "I should say that the nerve roots have been affected below the level of my injection." He had previously testified that the solution he used was

---

*Aside from the doctrine of res ipsa loquitur which will be discussed later.

"weighted" and the table tilted so as to be sure the fluid would "go down."

From this evidence, it could have been legitimately inferred by the jury that plaintiff Seneris' injuries were proximately caused from spinal cord damage caused by a spinal anesthetic administered between the twelfth thoracic and the first lumbar vertebrae; that a spinal anesthetic administered in that location was not good medical practice, or the exercise of that care and caution expected of a practicing physician in that community. ■ A defendant's conduct must always be gauged in relation to all the other material circumstances surrounding it, and if such other circumstances admit of a reasonable doubt as to whether such questioned conduct falls within or without the bounds of ordinary care then such doubt must be resolved as a matter of fact rather than of law. (*Mosley* v. *Arden Farms Co.*, 26 Cal.2d 213, 217 [157 P.2d 372, 158 A.L.R. 872]; *Toschi* v. *Christian*, 24 Cal.2d 354, 360 [149 P.2d 848]; *Estate of Lances*, 216 Cal. 397, 400 [14 P.2d 768]; *Raber* v. *Tumin*, 36 Cal.2d 654, 656 [226 P.2d 574]; *Palmquist* v. *Mercer, supra*, 43 Cal.2d 92, 95; *Warner* v. *Santa Catalina Island Co.*, 44 Cal.2d 310 [282 P.2d 12].)

■ It follows, therefore, that the trial court erred in granting a judgment of nonsuit as to defendant West.

APPLICABILITY OF THE DOCTRINE OF RES IPSA LOQUITUR

■ Defendants contend that the heretofore quoted testimony elicited from defendant doctors is not sufficient, without applying the doctrine of res ipsa loquitur, to permit plaintiffs to go to the jury. We are of the opinion that the evidence is sufficient, but we are also of the opinion that the jury, under appropriate instructions, should have been permitted to determine whether each of the conditions necessary to bring into play the rule of res ipsa loquitur were present (*Roberts* v. *Bank of America*, 97 Cal.App.2d 133, 137 [217 P.2d 129]).

■ Plaintiffs and defendants agree that the conditions to be met before the doctrine may be applied are that the accident, or injury, must be of a kind which ordinarily does not occur in the absence of someone's negligence; that it must be caused by an agency or instrumentality in the control of the defendant; and that it must not have been due to any voluntary action or contribution on the part of plaintiff. (*Ybarra* v. *Spangard*, 25 Cal.2d 486, 489 [154 P.2d 687, 162 A.L.R. 1258]; *Baker* v. *B. F. Goodrich Co.*, 115 Cal.App.2d 221, 226 [252 P. 2d 24]; *Burr* v. *Sherwin Williams Co.*, 42 Cal.2d 682, 687 [268 P.2d 1041].)

Plaintiffs argue that it is a matter of common knowledge that a woman does not ordinarily become permanently paralyzed following childbirth after having had a spinal anesthetic administered as an incident thereto; that Dr. Haas testified that "ordinarily where due care [was] used and proper practice followed, permanent paralysis [did] not follow"; that Dr. West testified that he had never had a case of permanent paralysis due to sensitivity to a spinal anesthetic; that he had made four or five thousand spinal punctures; that Dr. Carl's written report shows that it was his opinion that plaintiff's injuries were due to spinal cord damage; that spinal cord damage could be caused by a spinal anesthetic needle being inserted above the first lumbar vertebra; that it was most important that the spinal anesthetic be administered in a location below the conus medullaris, or the end of the spinal cord; that Dr. West had completed the administration of the spinal anesthetic within two minutes of the time of his arrival in the delivery room; that the anesthetic was administered by him without having "scrubbed."

Defendant West argues that paralysis may result from a number of causes other than negligence in giving a spinal anesthetic; that in a certain percentage of cases paralysis will result from spinal anesthesia without any negligence; that plaintiffs introduced no proof that the practice used by him in administering the anesthetic was not the desirable or standard practice; that it is of "no importance" that he did not scrub since he used sterile gloves; that plaintiffs introduced no proof that the spinal anesthetic fluid was ever injected in Mrs. Seneris' spinal canal.

We said in *Zentz* v. *Coca Cola Bottling Co.*, 39 Cal.2d 436, 442 [247 P.2d 344], so far as the first requirement is concerned—that the accident, or injury, must be of a kind which "ordinarily" or "probably" does not happen in the absence of negligence and that "In the LaPorte case, 33 Cal.2d at page 169 [199 P.2d 665], we said, after assuming that defendants were in control at the time of the accident, that 'the applicability of the doctrine of res ipsa loquitur depends on whether it can be said, in the light of common experience, that the accident was more likely than not the result of their [defendants'] negligence. [Citations.] "Where no such balance of probabilities in favor of negligence can be found, res ipsa loquitur does not apply." ' In determining whether such a probability exists with regard to a particular occurrence, the courts have relied both upon com-

mon knowledge and the testimony of expert witnesses. (See for example, *Cavero* v. *Franklin etc. Benev. Soc.*, 36 Cal.2d 301, 309 [223 P.2d 471]; *Escola* v. *Coca Cola Bottling Co.*, 24 Cal.2d 453, 459, 460 [150 P.2d 436]; *Juchert* v. *California Water Service Co.*, 16 Cal.2d 500, 515 [106 P.2d 886]; *Judson* v. *Giant Powder Co.*, 107 Cal. 549, 561 [40 P. 1020, 48 Am.St. Rep. 146, 29 L.R.A. 718].)''

█ We also said in *Zentz* v. *Coca Cola Bottling Co.*, *supra*, 39 Cal.2d 436, 445, that ''Another factor which some of the cases have considered in applying the doctrine is that the defendant may have superior knowledge of what occurred and that the chief evidence of the cause of the accident may be accessible to the defendant but inaccessible to the plaintiff. (See *Ybarra* v. *Spangard*, 25 Cal.2d 486, 490 [154 P.2d 687, 162 A.L.R. 1258]; *Mudrick* v. *Market Street Ry. Co.*, 11 Cal.2d 724, 731-732 [81 P.2d 950, 118 A.L.R. 533]; *Anderson* v. *I. M. Jameson Corp.*, 7 Cal.2d 60, 64 [59 P.2d 962]; *Smith* v. *O'Donnell*, 215 Cal. 714, 722 [12 P.2d 933]; *Kenney* v. *Antonetti*, 211 Cal. 336, 339 [295 P. 341]; *Connor* v. *Atchison, etc. Ry. Co.*, 189 Cal. 1, 5 [207 P. 378, 22 A.L.R. 1462]; *O'Connor* v. *Mennie*, 169 Cal. 217, 225-226 [146 P. 674]; *Steele* v. *Pacific Elec. Ry. Co.*, 168 Cal. 375, 378-379 [143 P. 718]; *Housel* v. *Pacific Elec. Ry. Co.*, 167 Cal. 245, 249-250 [139 P. 73, Ann.Cas. 1915C 665, 51 L.R.A.N.S. 1105]; *Wyatt* v. *Pacific Elec. Ry. Co.*, 156 Cal. 170, 174 [103 P. 892]. . . .)''

This factor is peculiarly applicable, as well as necessary, in the type of situation we have here—where a patient suffers injury while unconscious and in the care and custody of the defendant, or defendants.

It would appear that plaintiffs have made out a prima facie case by both medical testimony and common knowledge that the injuries suffered by Mrs. Seneris are not such as usually occur in the circumstances without negligence on the part of someone. Defendant West's assertions to the contrary are matters for the finders of the facts.

Apparently Mrs. Seneris was unconscious at the time the spinal anesthetic was administered. Defendant West contends that her condition could have been caused by a number of causes other than negligence in giving the anesthetic. There is no doubt that when Mrs. Seneris went to the delivery room she was in good health. █ We said in *Ybarra* v. *Spangard*, 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1058], that ''Every defendant in whose custody the plaintiff was placed for any period was bound to exercise ordinary care to see

that no unnecessary harm came to him and each would be liable for failure in this regard." ■ We also said that "where a plaintiff receives unusual injuries while unconscious and in the course of medical treatment, all those defendants who had any control over his body or the instrumentalities which might have caused the injuries may properly be called upon to meet the inference of negligence by giving an explanation of their conduct." ■ We also said in *Summers* v. *Tice*, 33 Cal.2d 80, 86-87 [199 P.2d 1, 5 A.L.R.2d 91], that ". . . a patient injured while unconscious on an operating table in a hospital could hold all or any of the persons who had any connection with the operation even though he could not select the particular acts by the particular person which led to his disability." We said too that the effect of the decision in the Ybarra case was that plaintiff had made out a case when he had produced evidence which gave rise to an inference of negligence which was the proximate cause of the injury; that it was then up to the defendants to explain the cause of the injury. ■ In order that a plaintiff be entitled to the benefit of the doctrine of res ipsa loquitur, he need not exclude every other possibility that the injury was caused other than by defendant's negligence (Prosser, Res Ipsa Loquitur in California, 37 Cal.L.Rev. 183, 197-198).

Defendant West argues that Mrs. Seneris has not met the third condition—that the injury must not have been due to any voluntary action or contribution on her part. This argument stems from the testimony of one of plaintiff wife's doctors that she suffered from a "psychic overlay factor" (a type of hysteria induced by emotional disturbance); and from Dr. West's assertion that Mrs. Seneris may have had a "sensitivity" to the anesthetic solution of which it was said the paralysis might have been a result. Plaintiffs proved that Mrs. Seneris had previously had an uneventful spinal anesthetic; and by expert testimony of Dr. Haas that she was presumed, medically speaking, nonallergic to spinal anesthesia. Plaintiffs also proved that Mrs. Seneris, at the time of her admission to the hospital, was a strong and healthy woman; that she suffered from no disease in which a spinal anesthetic would be contra-indicated.

■ In *Baker* v. *B. F. Goodrich Co.*, 115 Cal.App.2d 221, 229 [252 P.2d 24], it was said: "Where the evidence is conflicting or subject to different inferences, it is for the jury, under proper instructions, to determine whether each of the conditions necessary to bring into play the rule of res

ipsa loquitur are present. (*Roberts* v. *Bank of America,* 97 Cal.App.2d 133, 137 [217 P.2d 129].)'' (*Barham* v. *Widing,* 210 Cal. 206 [291 P. 173]; *Moore* v. *Belt,* 34 Cal.2d 525 [212 P.2d 509].) ▮ The conclusion that negligence is the most likely explanation of the accident, or injury, is not for the trial court to draw, or to refuse to draw so long as plaintiff has produced sufficient evidence to permit the jury to draw the inference of negligence even though the court itself would not draw that inference; the court must still leave the question to the jury where reasonable men may differ as to the balance of probabilities (Res Ipsa Loquitur in California, Prosser, 37 Cal.L.Rev. 183, 194-195). ▮ The inference of negligence is not required to be an exclusive or compelling one. It is enough that the court cannot say that reasonable men could not draw it. (*Bauer* v. *Otis,* 133 Cal.App.2d 439, 443 [284 P.2d 133].) ▮ The existence of the conditions upon which the operation of the doctrine is to be predicated is a question of fact and the right of the jury to find those facts must be carefully preserved (*Black* v. *Partridge,* 115 Cal.App.2d 639, 646 [252 P.2d 760]; *Rose* v. *Melody Lane,* 39 Cal.2d 481 [247 P.2d 335]; *Knell* v. *Morris,* 39 Cal.2d 450 [247 P.2d 352]; *Milias* v. *Wheeler Hosptial,* 109 Cal.App.2d 759 [241 P.2d 684].) We conclude, therefore, that plaintiffs' evidence is sufficient to submit to the jury, under proper instructions, the applicability of the rule of res ipsa loquitur. Defendants contend that the case of *Engelking* v. *Carlson,* 13 Cal.2d 216 [88 P.2d 695], is controlling concerning the application of the doctrine of res ipsa loquitur to the case at bar. While the two cases may be distinguished on their facts, we do not deem it necessary to do so here as we have concluded that the doctrine is applicable to the factual situation disclosed by the record in this case and any expression in the Engelking case which may be contrary to this conclusion is hereby disapproved.

Defendants' reliance upon the rule set forth in the case of *Ayers* v. *Parry* (New Jersey), 192 F.2d 181, is misplaced. There, plaintiff suffered injuries following a spinal anesthetic administered between the second and third lumbar vertebrae. Plaintiff had been brought into the hospital acutely ill with an infection and with a temperature of 103.6°. An emergency operation was found necessary to alleviate an obstruction to the common bile duct. Expert testimony showed there that plaintiff's condition was known as a cauda equinal neuritis produced by the spinal anesthesia; that certain nerve roots

had been injured; that the anesthesia had produced an inflammation about the spinal cord "that constricts and damages the nerves, . . . and which occurs due to some unusual reaction on the part of the patient to that solution." The court held that the doctrine of res ipsa loquitur was not available to the plaintiff under the circumstances. Whether or not we agree with the holding in the New Jersey case, it is apparent from further language of that court that the case is easily distinguishable from the one under consideration. The court said: "When the expert testimony offered by the plaintiff ascribes the cause to the toxic quality of the injected drug as distinguished from the negligence of the anesthetist, that evidence is binding upon the court and the jury would not be permitted to speculate to the contrary." The court also said: "Nor is the doctrine available in a case based upon want of skill in diagnosis, method or manner of treatment. Here, the process of treating the nerve roots by a drug to produce anesthesia in an operation to remove an obstruction to the common duct certainly requires technical knowledge and skill. Because the unfortunate consequences suffered by plaintiff *in themselves do not as a matter of common knowledge and experience reveal lack of skill in the anesthetist*, scientific opinion is clearly necessary to throw light on the subject." (Emphasis added.) In the case under consideration, plaintiffs proved, through the testimony of defendant doctors, that Mrs. Seneris' injuries were not such as usually happened when due care and proper practice were observed. In a malpractice case, plaintiff may make out a prima facie case through the testimony of the defendant (*Lawless* v. *Calaway,* 24 Cal.2d 81, 90 [147 P.2d 604]; *Anderson* v. *Stump,* 42 Cal. App.2d 761, 765 [109 P.2d 1027]).

### EVIDENCE AS IT RELATES TO DR. HAAS

 Plaintiffs contend that Dr. Haas is also liable for Mrs. Seneris' injuries in that he knowingly permitted Dr. West to administer the anesthetic negligently; in that he failed to call in a neurosurgeon or other consultant; in that he failed to arrange for a laminectomy to be performed on Mrs. Seneris; and under the doctrine of res ipsa loquitur.

The record shows that Dr. Haas had made arrangements for Mrs. Seneris to have a spinal anesthetic at the time of her delivery; that he had not arranged for Dr. West to give it. The record further shows that Dr. Haas testified that when he arrived in the delivery room he did not know whether Mrs. Seneris was conscious or not; that Dr. West was standing

by the patient's side removing the rubber gloves "that he uses when he gives his spinal"; that at the time of his entry into the delivery room Mrs. Seneris was lying on her back and a nurse was putting her legs into the stirrups preparatory to the spontaneous delivery of the child. It is obvious from this evidence that the spinal anesthetic had been completed by Dr. West prior to Dr. Haas' arrival in the delivery room.

Defendant Haas contends that whether or not he was negligent in failing to call in a neurosurgeon after discovering Mrs. Seneris' condition the following morning was a matter requiring expert opinion as to the standard practice in the community and that plaintiffs produced no such expert opinion. It is also argued that plaintiffs produced no evidence to show that such a failure was in any way the proximate cause of plaintiff Seneris' injuries or the cause of any aggravation thereof. These contentions appear to be meritorious. Whether Dr. Haas' failure to call in a neurosurgeon to examine Mrs. Seneris the following day constituted negligence depended upon expert testimony as to what an ordinarily skilled physician practicing in that vicinity, in the exercise of due care and professional judgment, would have done under the circumstances. (*Bickford* v. *Lawson,* 27 Cal.App.2d 416, 421-422 [81 P.2d 216].) Plaintiffs' further contentions with respect to Dr. Haas fail for the same reason: that no expert evidence was produced to show that Dr. Haas' failure to call in a neurologist in any way contributed to Mrs. Seneris' condition.

## EVIDENCE AS TO DEFENDANT HOSPITAL

Plaintiffs' first contention is that defendant hospital is liable under the doctrine of *respondeat superior* for the negligence of Dr. West in administering the spinal anesthetic to Mrs. Seneris.

Mr. Hoefflin, administrator of defendant hospital, testified as follows concerning the relationship between the hospital and Dr. West: That Dr. West was one of six anesthesiologists on the hospital staff; that these anesthetists were appointed by the board of directors of the hospital after having been approved and selected by the members of the medical staff (composed of doctors); that the six anesthetists constituted the medical staff of the Department of Anesthesiology "and their services were available to the members of the staff. Uniquely, they had an agreement among themselves in order to provide good anesthesia coverage to cover the hospital

on a 24-hour basis by themselves. Inasmuch as there were six, as I recall, they would cover on a 24-hour basis one night themselves in six as a person on first call, and another person on second call and third call, right down the line, which meant that one man would ordinarily be staying in the hospital after he finished his anesthesia work in the regular scheduled hours in order that any emergency surgery that came into the hospital or any obstetrical case would have anesthesia coverage there''; that the anesthetists are under the control of the medical staff; that no member of the board of directors has anything to do with them; that the anesthetist himself billed the patient for the anesthetic given by him; that the hospital furnished to the anesthetist the medications given, he supplies, needles, nursing service, white clothes, gloves, telephone service and a place to rest; that the anesthetist was required to make a written report on each anesthetic given. Mr. Hoefflin further testified that if an anesthetist was found to be unsatisfactory, the medical executive committee, as governing board of the medical staff, recommended to the board of directors of the hospital that action be taken.

Dr. West testified that he gave anesthetics at no hospital other than defendant hospital; that he had no office of his own but took calls at his home; that it was common practice for him to be summoned by a nurse at defendant hospital to administer an anesthetic to an obstetrical case; that one of the nurses on the obstetrical floor notified him to give the anesthetic to Mrs. Seneris. Dr. West testified that he did not see Dr. Haas until after he had finished administering the spinal anesthetic to Mrs. Seneris. Dr. West explained the call system to mean that when he had ''first'' call, he would give all the anesthetics necessary; that if he happened to be giving an anesthetic when another was needed, the anesthesiologist on ''second'' call would give that one; that if he were not busy giving an anesthetic, he would give them all. Dr. West testified that after Mrs. Seneris' difficulties arose he wrote a ''document'' of which he had copies made; that he presented one copy to the administrator of the hospital; that this was not required and was a report other than the usual and required anesthetic report to the hospital.

 Plaintiffs assign as prejudicial error numerous questions asked of Dr. West and Mr. Hoefflin to which objections were sustained. Plaintiffs contend that these questions were relevant and material on the issue of agency and, it appears

from the record, that plaintiffs are correct. The questions all had a bearing on the relationship existing between the hospital and the anesthetist, the amount of control exercised by the hospital, and the extent of its right of control, and the trial court erroneously sustained objections thereto. ▆ Unless the evidence is susceptible of but a single inference, the question of agency is one of fact for the jury (*Robinson* v. *George*, 16 Cal.2d 238, 240 [105 P.2d 914]). ▆ We said in *Rice* v. *California Lutheran Hospital*, 27 Cal.2d 296, 304 [163 P.2d 860], that "It should be noted that a nurse or physician may be the servant of a hospital, thus requiring the application of the doctrine of *respondeat superior* even though they are performing professional acts. (See *Brown* v. *La Societe Francaise*, 138 Cal. 475 [71 P. 516]; *Inderbitzen* v. *Lane Hospital*, 124 Cal.App. 462, 466 [12 P.2d 744, 13 P.2d 905]; *Bowman* v. *Southern Pac. Co.*, 55 Cal.App. 734 [204 P. 403].)"

▆ In *Stanhope* v. *Los Angeles College of Chiropractic*, 54 Cal.App.2d 141, 146 [128 P.2d 705], the court said: " 'An agency is ostensible when the principal intentionally or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him.' (Civ. Code, § 2300.) In this connection it is urged by appellant that 'before a recovery can be had against a principal for the alleged acts of an ostensible agent, three things must be proved, to-wit:' (quoting from *Hill* v. *Citizens Nat. Trust & Sav. Bank*, 9 Cal.2d 172, 176 [69 P.2d 853]) '[First] The person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one; [second] such belief must be generated by some act or neglect of the principal sought to be charged; [third] and the third person in relying on the agent's apparent authority must not be guilty of negligence. (1 Cal.Jur. 739; *Weintraub* v. *Weingart*, 98 Cal.App. 690 [277 P. 752].)'

"An examination of the evidence hereinbefore referred to which was produced on the issue of agency convinces us that respondent has met the requirements enumerated in the Hill case. So far as the record reveals appellant did nothing to put respondent on notice that the X-ray laboratory was not an integral part of appellant institution, and it cannot seriously be contended that respondent, when he was being carried from room to room suffering excruciating pain, should have inquired whether the individual doctors who examined him were employees of the college or were independent contractors. Agency is always a question of fact for the jury."

Plaintiffs here through the questions permitted them showed that defendant West was one of six anesthetists on defendant hospital's panel, or staff; that he gave anesthetics for no other hospital; that all drugs and equipment used by him were supplied by said hospital; that he had regular "on call" duty at said hospital; that a hospital nurse summoned him to give the anesthetic in question. It appears that this evidence is sufficient to establish, prima facie, that defendant West was an agent of defendant hospital. There is nothing in the record to show that plaintiffs should have been on notice that defendant West was not an employee of defendant hospital and it can not be "seriously contended" that she was obliged to inquire whether each person who attended her in said hospital was an employee or an independent contractor. It follows that the trial court erred in taking the issue of agency from the jury.

EXCLUSION OF EXPERT TESTIMONY OFFERED BY PLAINTIFFS

Plaintiffs contend that the trial court committed an abuse of discretion and prejudicial error in excluding in its entirety the testimony taken by way of deposition of Dr. Frank Webb, now deceased. Dr. Webb's testimony was offered for the bearing it would have on anatomy, pathology, histology and causation as involved in the case at bar. Dr. Webb's testimony was not offered as expert evidence on the proper and requisite degree of skill and care used by practicing physicians in the community. (See *Huffman* v. *Lindquist*, 37 Cal.2d 465, 478 [234 P.2d 34, 29 A.L.R.2d 485], where Dr. Webb's testimony was held properly excluded when offered to show the required standard of care.)

Dr. Webb's testimony was offered to show the location and cause of Mrs. Seneris' paralysis; that her injury was traumatic and mechanical in nature; the means by which the injury occurred; that the anesthetic needle had been inserted in the area opposite the twelfth thoracic and first lumbar vertebrae; that the spinal cord had been punctured and the cord injured by the anesthetic fluid.

Among Dr. Webb's many qualifications as an expert in the anatomical field, and as to the cause of plaintiff wife's injuries, we note that he had seen about 1,000 spinal cords; had examined from 100 to 150 cases involving injury to the spinal cord with resulting paralysis; that in autopsies he had examined the spinal cord to determine the location of an injury thereto; that he had examined the spinal cord both

grossly and microscopically; that he was able to trace and connect the history of paralysis to an injury to the spinal cord; that he had treated, advised and consulted many patients suffering from disease, injury or damage to the spinal cord.

In *Agnew* v. *City of Los Angeles,* 97 Cal.App.2d 557, 565 [218 P.2d 66], where the court reversed a judgment because the trial court had erroneously excluded the testimony of one Dr. Andrews, it was said that "the court effectively denied plaintiff a fair opportunity to prove her case." It was there held that "To qualify a witness as a medical expert it must be shown that the witness (1) has the required professional knowledge, learning and skill of the subject under inquiry sufficient to qualify him to speak with authority on the subject, and (2) is familiar with the standards required of physicians under similar circumstances. (*Moore* v. *Belt,* 34 Cal.2d 525, 532 [212 P.2d 509]; *Sinz* v. *Owens,* 33 Cal.2d 749, 753 [205 P.2d 3, 8 A.L.R.2d 757]; 32 C.J.S. 261, § 537.)

Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than its admissibility. (*Cloud* v. *Market Street Ry. Co.,* 74 Cal.App.2d 92, 100 [168 P.2d 191]; 10 Cal.Jur. 963; 2 Wigmore on Evidence, 3d ed., 641; 31 C.J.S. 99-101.) The qualification of an expert is ordinarily a matter addressed to the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless a clear abuse is shown. (*Sinz* v. *Owens,* 33 Cal.2d 749, 753 [205 P.2d 3, 8 A.L.R.2d 757]; *Mirich* v. *Balsinger,* 53 Cal. App.2d 103, 114 [127 P.2d 639].) The determinative test as to whether the trial court properly exercised its discretion is whether the witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury. (*Valdez* v. *Percy,* 35 Cal.App.2d 485, 492 [96 P.2d 142]; *Hutter* v. *Hommel,* 213 Cal. 677, 681 [3 P.2d 554]; *Pierce* v. *Paterson,* 50 Cal.App.2d 486, 491 [123 P.2d 544]; *Mirich* v. *Balsinger,* 53 Cal.App.2d 103, 115, 118 [127 P.2d 639]; 32 C.J.S. 261, § 537.)"

In addition to the specific qualifications heretofore set forth, Dr. Webb was a physician and surgeon licensed in California since 1920. He had been in private practice in New York; had been in charge of railroad employees hospital where he had treated men paralyzed because of injury to the spinal cord. Dr. Webb had also taught anatomy and histology

in the University of Southern California medical school as well as in its dental college. Dr. Webb had been autopsy surgeon for the county of Los Angeles for over 30 years prior to his death.

It appears to us that the trial court clearly abused its discretion in excluding Dr. Webb's deposition and "effectively denied plaintiff a fair opportunity to prove her case." (*Agnew* v. *City of Los Angeles, supra,* 97 Cal.App.2d 557, 568.)

### OTHER CONTENTIONS

Plaintiffs charge all defendants with negligence in having failed to perform, or have performed, a laminectomy upon Mrs. Seneris after her injuries were discovered. Plaintiffs produced no expert evidence that a laminectomy was indicated in a case such as the one under consideration other than an affirmative answer by Dr. West to a statement made by plaintiffs' counsel that a laminectomy (a sort of picture window in the backbone) is indicated where there has been cord damage. Plaintiffs produced no expert testimony that such an operation would have alleviated Mrs. Seneris' condition. Surgery and the necessity therefor, and effect thereof, is in most instances not a matter of common knowledge.

Defendants contend that plaintiffs' pleading was not sufficiently broad to encompass their claim that a laminectomy should have been performed. We do not agree. Plaintiffs alleged that all defendants were negligent in regard to her "medical care." The pleading is sufficient under the general rule of liberal construction. (*Greninger* v. *Fischer,* 81 Cal.App.2d 549, 552 [184 P.2d 694].)

It may be that on a retrial plaintiffs may be able to show by expert medical testimony that such surgery was not only indicated but would have been performed as standard medical procedure in the community.

The judgment of nonsuit as to defendant Haas is affirmed and as to all other defendants it is reversed.

Gibson, C. J., Traynor, J., and Schauer, J., concurred, Spence, J., concurred in the judgment.

The petition of respondent Dr. West for a rehearing was denied January 18, 1956.