[Civ. No. 9342.   Third Dist.   Apr. 28, 1959.]

HELEN JAMES, Appellant, v. J. LESLIE SPEAR, Respondent.

Philander Brooks Beadle and Ernest E. Emmons, Jr., for Appellant.

Peart, Baraty & Hassard and Alan L. Bonnington for Respondent.

VAN DYKE, P. J.—Plaintiff and appellant brought this action to recover damages from defendant and respondent (a physician practicing his specialty in eye, ear, nose and throat conditions) for alleged negligence resulting in injury to appellant's right eye. Respondent was granted a nonsuit and the appeal is from the judgment following the order.

Appellant's evidence discloses the following: Respondent undertook to treat a stopped tear duct leading from appellant's right eye so as to permit the duct to perform its function of draining lachrymal fluid from the eye. Appellant

visited respondent 13 times for treatment of the duct. At no time did respondent treat plaintiff for any condition concerning the eyeball nor was there anything wrong with the eyeball. On the occasion of her thirteenth visit to respondent's offices, it was respondent's intention to make a final inspection of the tear duct and, if nothing wrong appeared, to discharge her as cured. Appellant sat in the treatment chair, respondent picked up an instrument, came to her and stood over her, examining her eye with a mirror and light on his head and the instrument in his hand. He had at that time applied no anesthetic to her eye. Appellant had no pain in her right eye. As respondent stood there examining her eye she lapsed into an unconscious state. As she described it, she "blacked out." She had no explanation therefor, but had never had a fainting spell before. Trauma to the eyeball can cause a patient to faint. She was unable to say how long she remained unconscious, but when she regained consciousness she immediately felt a terrible pain in her right eye, which she could not open. With her left eye she saw respondent mopping her face with some tissues and rubbing off water. She was still in the same chair with respondent standing over her. She immediately complained to respondent of the extreme pain in her right eye and he began putting something around the eye to ease the pain. His office nurse ran in with a hypodermic needle and respondent applied an anesthetic to her right eye. She could not see with the eye and it had a dead feeling. Respondent then applied salve to the eye, put dark glasses on her, and helped her out of the chair and to the outer office. She asked him what was wrong with her eye and he said it would be all right in 24 hours. Appellant left respondent's office and went to a drugstore nearby and while there the pain in her eye grew worse. She went to a parking lot and sat in her car. The pain became unbearable and she returned to respondent's office. He examined and washed out her right eye and told her "it looks like a piece of steel had taken a cut, a piece off the eye." His examination revealed an abrasion of the cornea, that is, a break in the surface membrane of the eye. A corneal abrasion can be very painful. He injected a pain reliever and gave her prescriptions to lessen the pain. As she was leaving she told the nurse and respondent that she wanted to return. The nurse said "No." Respondent said nothing. She went to the drugstore and got the prescriptions filled. Her eye was swollen shut. She went

to her car to rest and by this time the anesthetic had partly worn off and she was again in pain. During the next several hours as she sat in her car she had periods of unconsciousness. She finally drove home. When she arrived her right eye was swollen shut, she had red welts down the side of her face, and she went to bed where she remained two or three days. Five days after the incident in respondent's office appellant was taken to respondent's office by one of her daughters, but as the office was closed she visited another doctor. At this time her eye was badly swollen. The examination by the second doctor revealed the abrasion of the cornea of her right eye. She was treated by the second doctor for about two weeks and then she went to see respondent. She told him her husband had been quite angry when she arrived at home with her eye in such condition and respondent remarked he did not blame the husband. He also said he would fit her for glasses free of charge. He evaded answering questions as to what had happened to her eye but he did order glasses for her, adjusted them, and made no charge. After the first incident respondent saw plaintiff five or six times and made no charge for his services. Respondent told Helen Janice Callaway, a daughter of appellant, who was a registered nurse, and who questioned him about what had happened to her mother's eye during the morning visit, that he thought her eye was then well; that when he looked in her eye at that time he "thought he saw something" so he took an instrument to look at it and "that was when it happened." Mrs. Callaway asked to see respondent's charts pertaining to her mother's treatment on that day and the charts brought to her were materially different from those produced by respondent at the trial. The chart for the day the incident occurred showed only a morning visit and not the afternoon visit, of which there was no record entered. Mrs. Callaway asked him why appellant's return visit in the afternoon was not entered on the chart and received no explanation. Respondent changed the subject. He did then tell her, however, that he would make appellant's glasses and that it would not cost appellant anything. There was opinion testimony that the abrasion could have been caused by any trauma, such as a surgical instrument striking the eye.

A physician who treated appellant's eye after the corneal abrasion was suffered testified as a witness for appellant concerning his treatment and gave some opinion evidence. On cross-examination he gave further testimony both as to

what he observed and as to what, in his opinion, was the origin of the abrasion. Insofar as this testimony contradicted or was opposed to the evidence we have related, it must be ignored in testing the validity of the nonsuit. (*Karstensen* v. *Western Transportation Co.*, 93 Cal.App.2d 435, 438 [209 P.2d 47]; *Burns* v. *Jackson*, 53 Cal.App. 345, 347 [200 P. 80].)

■ Appellant made out a prima facie case of negligence on the part of respondent, and the judgment of nonsuit must be reversed. From all of the evidence it could have been legitimately inferred by the jury that the abrasion of the cornea of appellant's right eye was proximately caused by a negligent act of respondent while he was standing over her looking into the eye and using a surgical instrument. The evidence was ample to prove that the abrasion occurred at that time. The appellant's blacking out could be referred to the trauma that caused the abrasion, which in turn caused the extreme pain appellant was suffering when she regained consciousness. From the direct evidence, from opinion evidence and from respondent's admissions it could be inferred that the abrasion to the cornea of the eye, which respondent was not treating, was the result of negligence during his treatment of the accessory tear duct. Stated in terms of the doctrine of res ipsa loquitur, which we hold was applicable, this injury was something which ordinarily does not occur in the absence of someone's negligence; and the jury, under proper instructions, could have found that the abrasion was caused by an instrumentality in the control of respondent and was not due to any action or contribution on the part of appellant. (*Seneris* v. *Haas*, 45 Cal.2d 811 [291 P.2d 915, 53 A.L.R.2d 124], *Wolfsmith* v. *Marsh*, 51 Cal.2d 832 [337 P.2d 70].)

Appellant argues that there is another theory under which respondent could have been found to have been negligent in such a way as to proximately cause the abrasion. The theory is dependent upon additional evidence not heretofore related. There was evidence that, contrary to the testimony of appellant, the respondent did anesthetize appellant's right eye before investigating the condition of the tear duct; that standard practice required him, before permitting her to leave, to warn her not to rub her eye, because, as the testimony revealed, it is natural for a person after treatment to the eye to rub the eye, and since the anesthesia results in a weakening of the covering membrane of the eyeball and in a lessening of the sensitivity of it, any rubbing is apt to be

violent enough to abrade the membrane. Appellant testified that she received no such instruction and respondent called under section 2055 of the Code of Civil Procedure does not negative the testimony of appellant. We think it unnecessary to discuss this claim of appellant. The evidence on the subject may be quite different upon the next trial and it would be fruitless to discuss the matter now.

The judgment appealed from is reversed.

Peek, J., and Schottky, J., concurred.

A petition for a rehearing was denied May 28, 1959, and respondent's petition for a hearing by the Supreme Court was denied June 24, 1959.