[Civ. No. 54575. Second Dist., Div. Three. Aug. 22, 1979.]

JILL CHADOCK, Plaintiff and Appellant, v.
LESTER COHN, Defendant and Respondent.

COUNSEL

Moriarity & Tepper, John L. Moriarity and Gerald H. B. Kane, Jr., for Plaintiff and Appellant.

Home & Clifford, Mary E. Porter, Alan L. Rushfeldt and Arthur E. Schwimmer for Defendant and Respondent.

OPINION

**ALLPORT, J.**—In her complaint plaintiff, Jill Chadock, seeks damages for medical malpractice from Lester Cohn, M.D. The gravamen of the action is alleged to be negligence in the care and treatment of a leg and foot injury resulting in permanent disability and disfigurement.[1] The trial commenced before a jury and was terminated by the granting of a motion for nonsuit at the conclusion of plaintiff's evidence. The motion for nonsuit was made on the ground that there was no showing of "negligent causation." The failure of proof resulted from the trial court's ruling that Nicholas Grumbine, plaintiff's expert witness, was incompetent to testify as to the applicable standard of practice because he was a podiatrist and not a licensed medical doctor (M.D.). Plaintiff appeals from the judgment entered in favor of defendant following the granting of the motion of nonsuit.

CONTENTION

The sole contention on appeal is that it was reversible error to sustain the objection to his testimony on the subject.

DISCUSSION

██ We find the applicable law to be set forth in *Brown* v. *Colm* (1974) 11 Cal.3d 639, 642-643 [114 Cal.Rptr. 128, 522 P.2d 688], wherein it is

---

[1] Specifically a triple arthrodesis and a mid-tarsal osteotomy had been performed by Dr. Cohn in 1971.

said: "It is settled that a doctor is required to apply that degree of skill, knowledge and care ordinarily exercised by other members of his profession under similar circumstances. (*Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 788 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717]; *Sinz* v. *Owens* (1949) 33 Cal.2d 749, 753 [205 P.2d 3, 8 A.L.R.2d 757].) Proof of this standard is ordinarily provided by another physician, and if a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes to the weight of his testimony rather than to its admissibility. (*Seneris* v. *Haas* (1955) 45 Cal.2d 811, 833 [291 P.2d 915, 53 A.L.R.2d 124].)" ■ The determination of the expert's qualifications is ordinarily a matter addressed to the sound discretion of the trial court and will not be disturbed on appeal absent a clear showing of abuse. (*Evans* v. *Ohanesian* (1974) 39 Cal.App.3d 121, 127 [112 Cal.Rptr. 236].)

Defendant relies upon the proposition that a witness who testifies to the applicable standard as an expert must not only be a medical doctor, but must possess knowledge concerning the standard of practice of an "orthopedic surgeon."[2] He argues that Dr. Grumbine, a podiatrist, was not qualified as a matter of law to testify in this case. We do not agree.

The propriety of Dr. Grumbine's testifying as an expert witness was considered at an evidentiary hearing conducted pursuant to Evidence Code section 402. ■ The test to be applied at such a hearing is simply whether the witness possessed the "special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720.) The subject is elaborated upon in the leading case of *Seneris* v. *Haas* (1955) 45 Cal.2d 811 [291 P.2d 915, 53 A.L.R.2d 124], wherein it was said at page 833: "In *Agnew* v. *City of Los Angeles*, 97 Cal.App.2d 557, 565 [218 P.2d 66], where the court reversed a judgment because the trial court had erroneously excluded the testimony of one Dr. Andrews, it was said that 'the court effectively denied plaintiff a fair opportunity to prove her case.' It was there held that 'To qualify a witness as a medical expert it must be shown that the witness (1) has the required professional knowledge, learning and skill of the subject under inquiry sufficient to qualify him to speak with

---

[2]The record does not indicate that defendant was in fact a board certified orthopedic specialist or for that matter a so-called "orthopedist" or "orthopedic surgeon." He was not dignified as such in the pleadings nor are we aware wherein the details of his qualifications or practice were developed in the record.

authority on the subject, and (2) is familiar with the standards required of physicians under similar circumstances. (*Moore* v. *Belt,* 34 Cal.2d 525, 532 [212 P.2d 509]; *Sinz* v. *Owens,* 33 Cal.2d 749, 753 [205 P.2d 3, 8 A.L.R.2d 757]; 32 C.J.S. 261, § 537.) Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than its admissibility. (*Cloud* v. *Market Street Ry. Co.,* 74 Cal.App.2d 92, 100 [168 P.2d 191]; 10 Cal.Jur. 963; 2 Wigmore on Evidence, 3d ed., 641; 31 C.J.S. 99-101.) The qualification of an expert is ordinarily a matter addressed to the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless a clear abuse is shown. (*Sinz* v. *Owens,* 33 Cal.2d 749, 753 [205 P.2d 3, 8 A.L.R.2d 757]; *Mirich* v. *Balsinger,* 53 Cal.App.2d 103, 114 [127 P.2d 639].) The determinative test as to whether the trial court properly exercised its discretion is whether the witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury. (*Valdez* v. *Percy,* 35 Cal.App.2d 485, 492 [96 P.2d 142]; *Hutter* v. *Hommel,* 213 Cal. 677, 681 [3 P.2d 554]; *Pierce* v. *Paterson,* 50 Cal.App.2d 486, 491 [123 P.2d 544]; *Mirich* v. *Balsinger,* 53 Cal.App.2d 103, 115, 118 [127 P.2d 639]; 32 C.J.S. 261, § 537.)' " Neither section 720 nor *Seneris* requires that the witness be a medical doctor or otherwise possess the same professional degrees or certifications held by the attending surgeon.

At the evidentiary hearing in the instant case Dr. Grumbine testified in detail with respect to the subject at hand and disclosed an inordinate background of education, knowledge, training and experience in the care and treatment of foot injuries.[3] He testified, inter alia, as follows:

"Q. Have you engaged in surgical practice—for how long have you been licensed? . . .

"A. I have been licensed for six years, . . .

"Q. All right, now as to you, Dr. Grumbine, did you undergo any intern and/or residency training?

"A. Yes, I took a two-year surgical program and podiatric medical program at the Southern California Podiatric Medical School. . . .

[3]Surgical treatment of the foot by a podiatrist is authorized by Business and Professions Code section 2525.13 which provides: "The certificate to practice podiatric medicine authorizes the holder to practice podiatric medicine. As used in this chapter:

"Podiatric medicine means the diagnosis, medical, surgical, mechanical, manipulative, and electrical treatment of the human foot, including the nonsurgical treatment of the muscles and tendons of the leg governing the functions of the foot. No podiatrist shall do any amputation or administer an anesthetic other than local."

"Q. Excuse me, just a minute. All right, please, if you would, what does your residency and your degree qualify you to do, please?

"A. This is—the residency has qualified me for doing any procedure of diagnosis and treatment there are of the foot, other than amputation.

"Q. All right, and then in your specialty, what types of foot care do you provide patients?

"A. I—in my own office, I provide entire scope of practice, and I have a subpractice—which deals—in my practice, which deals with major reconstructive surgery of the foot.

"Q. All right, sir, and this subspecialty that you have of major reconstructive surgery, what does that include?

"A. This includes triple arthrodesis, this includes mid-tarsal osteotomies, this includes tarsal tunnel decompressions, it includes any of the major procedures that are done to the foot. . . .

"Q. And we first talked about the triple arthrodesis that was performed in this case, wasn't it, sir?

"A. Yes, it was.

"Q. And the second is the mid-tarsal osteotomy?

"A. That is also one of the areas in which I've dealt with a lot with, yes, and have expertise in.

"Q. And have you performed many of those surgeries yourself?

"A. A fair number, yes.

"Q. All right, sir, and then there was also a tarsal tunnel?

"A. Yes.

"Q. A surgical procedure performed in this case; isn't that right, sir?

"A. Yes.

"Q. And you performed those?

"A. Right, quite a number.

"Q. And where is your—in what town is your office, please, sir?

"A. My office is in Fullerton, California.

"Q. All right, sir, and with what hospitals are you on the staff of, please?

"A. I'm on the staff of Good Samaritan Hospital in Anaheim, I'm also on the staff of Apollo Air Community Hospital, La Palma Intercommunity Hospital, Whittier Community Hospital, Greater El Monte Hospital. Those are primarily the hospitals that I use.

"Q. Sir, in addition to doing—now, have you done these surgical procedures at these various hospitals?

"A. Yes, I have.

"Q. All right, sir, and are these hospitals that just podiatrists do surgery in?

"A. No, sir.

"Q. What other type of members of the healing arts do surgical procedures there?

"A. Of this particular type, orthopedists and podiatrists and other specialties involved in medicine are involved in these hospitals. . . .

"Q. BY MR. MORIARITY: Here it comes: Dr. Grumbine, have you ever been cleared by an orthopedic board at any hospital here in the community?

"A. Yes.

"Q. And what hospital, please?

"A. That was at Good Samaritan Hospital. . . .

"Q. BY MR. MORIARITY: Well, since that time, have you been permitted to do triple arthrodesis at that hospital?

"A. Yes.

"Q. And have you been restricted as to any of these other medical procedures that you've mentioned, in any way, at that hospital?

"A. No.

"Q. So, in other words, you're qualified to do any of the major reconstructive foot surgery that you've mentioned there, is that true, sir?

"A. That's true.

"Q. All right, now, in addition to those hospitals, have you had occasion to perform any triple arthrodesis surgeries in any M.D. hospitals here in the San Fernando Valley, for example?

"A. Yes, yes, I have, over at Van Nuys Community Hospital with a Dr. Buratti. . . .

"Q. Now, Dr. Buratti, is he an M.D., or is he a podiatrist?

"A. He's a podiatrist, also.

"Q. When did you perform that surgery, sir?

"A. I've done it on several occasions.

"Q. All right.

"A. I don't recall the more recent one. There was [sic] several of them last summer.

"Q. In addition to your practice of surgery of the foot, have you held any teaching positions concerning major reconstructive surgery of the foot?

"A. Yes, I have.

"Q. What have those been, sir, please?

"A. Well, presently I'm Chief of Reconstructive Surgery at Good Samaritan Hospital for the foot. And that's in Anaheim, which is the residency training facility for foot surgeons, that is podiatrists. And I'm also Co-Chief of Surgery at the Southern California Podiatric Medical Center in Los Angeles which is on Hope Street across from the California Lutheran Hospital.

"Q. And as chief at one place and co-chief at the other place, what do you teach and who do you teach?

"A. I'm—I teach residents on the art of doing surgery as well as the practice of doing surgery; of the evaluation of patients, both for what deformities, what is present and also teaching them how to do the actual procedures themselves; and how to take care of the patient after the surgery has been performed; as well as injury cases and cases that do not involve surgery. . . .

"Q. And as far as the training, both that you've had in your residency periods and as chief and co-chief of these departments, do you use—let me put it this way: Do you restrict literature to podiatry medicine or do you teach from any other type of treatises?

"A. I read just about all the different journals that deal with the foot reconstruction, including the podiatry journals, including the clinical orthopedics, including orthopedic texts, including a number of other journals that have related subjects; and collect articles of other specialties that also relate to the foot.

"Q. And, sir, specifically with regard to the orthopedic texts, do you use those in your teaching as well as the podiatry texts?

"A. Yes, I do.

"Q. And as far as your instruction of you is concerned when you did your undergraduate work and your residency work, did you use orthopedic texts?

"A. Sure did. . . .

"Q. Are you familiar, Doctor, with how an M.D. performs a triple arthrodesis?

"A. Yes.

"Q. And what is your basis for that familiarity with how they perform triple arthrodesis?

"A. The orthopedic texts. . . .

"Q. Doctor, in my own clumsy way, what I'm trying to ask, let's see if I can get it this way: As far as the M.D. texts and the podiatry texts, is there any difference in the outcome as far as textbooks are concerned on how, say, a triple arthrodesis should be done?

"A. No.

"Q. Is there any difference as far as, say, an osteotomy is performed?

"A. No—. . . .

"Q. BY MR. MORIARITY: And as far as the tarsal tunnel is concerned, is there any difference as far as the textbooks are concerned, concerning the method, procedure and outcome?

"A. No. . . .

"Q. And what of your professional work has taken you into contact with M.D.'s who do foot surgery, sir?

"A. I have dealt with orthopedists who do foot surgery, both from the standpoint of dealing with some of their surgical problems as well as

having them deal with some of my surgical problems, and we've also dealt with each other on the same boards and hospitals.

"Q. And when you say 'dealing,' they deal with some of your surgical problems and you deal with some of their surgical problems, what do you mean, more—

"A. Well, there are occasions when we may seek consultation from each other as well as there are problems and complications that occasionally a patient will seek the advice of another doctor, and they will be seeing some of my patients and I've seen some of their patients.

"Q. And then on the staffs of the hospital, how does the interplay between the M.D. and the podiatrist there work, sir?

"A. As far as the actual hospital admission of patients, is that what you are referring to?

"Q. Well, I was thinking more of the interplay between the M.D. and yourself on the boards—whatever that—

"A. On the surgical boards?

"Q. All right, surgical boards.

"A. All right, on the Surgery Committee, which is the department of most hospitals—at least ones that I'm on; and the Podiatry Committee is a subcommittee on the Surgery Committee of which also the orthopedist is a subcommittee on the Surgery Committee. And when there is a situation that arises that needs to be handled and a joint committee is usually formed in order to settle any dispute that there is and [an] overlapping between the two areas.

"Q. And have you ever served on such committees?

"A. Yes, I have."

■ In deciding the issue, statements by the court below indicate that its ruling was based solely upon the fact that Dr. Grumbine was a podiatrist rather than a physician and surgeon. The trial court stated that in malpractice judgment cases, "The persons that testify to that are his peers; physicians and surgeons. That is the legal, substantive law in this area." The court went on to say, "Your man doesn't meet that standard, no matter how qualified he might be. That would be one reason to say that he couldn't testify here." While the court did go on to impugn the credibility of Dr. Grumbine as to his other qualifications, our reading of the entire ruling leads to the conclusion that the objection was sustained

on the ground upon which it was originally made, namely that Dr. Grumbine was not a medical doctor. The ruling leads us to believe that the court was unaware of the applicable law discussed herein. To decide the issue as a matter of law was therefore an abuse of discretion. The witness' qualifications were such as to permit the trier of fact to conclude he was familiar with the standards required of physicians with Dr. Cohn's qualifications.[4]

Our decision herein does not do undue violence to medical defendants' need for protection in malpractice cases. The existence of such need was discussed in *Brown* v. *Colm, supra,* at page 646, wherein it is said: "On the other hand, if the threshold test of general testimonial qualification is found to be met and the witness is permitted to testify on direct examination, he is subject to as penetrating a cross-examination as the ingenuity and intellect of opposing counsel can devise. This inquiry may challenge not only the knowledge of the witness on the specific subject at issue, but also the reasons for his opinion and his evaluation of any written material upon which he relied in preparation for his testimony. (Evid. Code, § 721.) Further, a defendant is free to argue that the witness' testimony is not entitled to acceptance or credibility because he lacks personal acquaintance with the subject at the time the alleged negligent act occurred, and defendant may produce his own witnesses in rebuttal. These measures are more than adequate to protect a defendant's interests." However, we must agree with plaintiff that: "[t]he unmistakable general trend in recent years . . . toward liberalizing the rules relating to the testimonial qualifications of medical experts" emphasized in *Brown* v. *Colm, supra,* at page 645, together with the rationale of our high court in its unanimous opinion in that case literally compels the conclusion that the trial court's ruling in the instant case was error.[5] (Cf. *Seneris* v. *Haas, supra,* 45 Cal.2d 811, 833.)

This error was clearly prejudicial. The sole basis for granting the nonsuit herein was the lack of evidence in the record to establish an

[4]As a corollary it is argued that Dr. Grumbine's testimony did not reveal he was familiar with the standard of practice as it existed in 1968-1971. However the doctor's testimony and the offer of proof was susceptible to the conclusion that Dr. Grumbine could not only testify as to the applicable standard of practice in the community but that another M.D. would be called to testify that the standard of practice was the same in 1968-1971 as it was in 1977.

[5]By so holding, we do not infer that this testimony establishes the existence of either negligence or proximate cause but only that it was error to refuse to admit the testimony in evidence. Its probative value remains to be determined by the trier of fact.

applicable standard of care. The evidentiary ruling discussed above deprived plaintiff of attempting to meet her burden of proof in this respect.

The judgment is reversed.

Klein, P. J., and Potter, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied November 8, 1979. Mosk, J., and Richardson, J., were of the opinion that the petition should be granted.