[Civ. No. 30463. First Dist., Div. Four. Apr. 20, 1973.]

KENNETH CLINE et al., Plaintiffs and Appellants, v.
ANTHONY LUND et al., Defendants and Respondents.

**COUNSEL**

Bostwick & Rowe, Robert Burns Bostwick, Everett P. Rowe, Tunney & Carlyle and Eric D. Carlyle for Plaintiffs and Appellants.

Rankin, Oneal, Center, Luckhardt, Marlais, Lund & Hinshaw, Edward A. Hinshaw, Hoge, Fenton, Jones & Appel, John W. Appel and H. R. Lloyd, Jr., for Defendants and Respondents.

**OPINION**

**GOOD, J.**\*—Appellants, surviving husband and four minor children of one Nancy Cline (hereinafter "decedent"), appeal from a judgment in favor of Anthony Lund, M.D., and the Los Gatos-Saratoga Community Hospital, in an action for medical malpractice. A pivotal issue arises out of the trial court's refusal of conditional res ipsa loquitur instructions that appellants requested. Bearing in mind that one of the key issues herein is whether the trial court erred in refusing a conditional res ipsa loquitur instruction, there is substantial evidence to establish the following facts:

Decedent had a history of female problems. In early June 1967, her family physician, William Kuhlman, M.D., referred her to respondent Anthony Lund, M.D., a specialist in obstetrics and gynecology. Dr. Lund scheduled decedent for a diagnostic dilatation and curettage and frozen

---

\*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

section with examination under anesthesia, and for an exploratory laparotomy with excision of a left ovarian cyst and possible hysterectomy, if warranted.[1] Decedent entered the hospital on July 9, 1967. Her entrance examination revealed a blood pressure of 110/72 and a normal complete blood count. She was 29 and in general good health. She had borne four children and had one pregnancy that miscarried.

The surgery was on July 10, 1967, from 7:40 until 10:15 a.m. Based on the results of the frozen section and the exploratory laparotomy, and after inspection of decedent's pelvis, Dr. Lund did a total abdominal hysterectomy (removal of uterus and cervix) and left salpingo-oophorectomy (removal of left fallopian tube and left ovary). Dr. Lund determined that decedent had a chronic pelvic inflammatory disease and a resultant hydrosalpinx (puss mass in fallopian tube covered with water) requiring removal of the uterus. Louis Lichtenstein, M.D., who reviewed the pathology reports, testified that there was no chronic pelvic inflammatory disease, nor hydrosalpinx, and that the uterus should not have been removed. The left ovary was cystic. Contrary to Dr. Lichtenstein's findings, the pathology report from the hospital laboratory confirmed Dr. Lund's findings. According to those in attendance, the operation had proceeded uneventfully. Decedent lost between 350 cc and 400 cc of blood, not enough to warrant a transfusion. Except for a complaint of nausea at 10 p.m., decedent initially made normal post-surgical progress.

The next day, Teresa Michelson, M.D., the anesthesiologist, saw decedent at about noon. Decedent was alert and the two chatted briefly. Between 1 and 1:30 p.m., Dr. Kuhlman saw decedent propped up in bed, sipping a glass of liquid. Her eyes were open and blinking, but she did not respond to conversation. The doctor thought this strange but attributed it to an emotional state. At about 2:30 p.m., decedent was dangled from the side of her bed by a nurse. Although the nurse did not feel that decedent tolerated the dangling as well as she should have, the nurse wrote in the records that decedent tolerated the dangling fairly well. At 3:30 p.m., decedent regurgitated a large amount of emesis, which was described by the patient in the adjoining bed as of massive force and hitting the opposite wall. Thereafter decedent remained continuously unresponsive to verbal stimulation.

During this period, decedent's vital signs were monitored at approxi-

---

[1] In a D & C and frozen section, the uterus is scraped and a slide made to determine if the lining is cancerous. In a laparotomy, the abdominal wall is opened so that the surgeon can diagnose the patient's condition and decide on the further course of surgery. (Webster's New Internat. Dict. (3d ed. 1965) p. 1271.)

mately four-hour intervals. Her blood pressure, although still within normal limits, had been slowly but steadily rising. At 9 p.m., decedent's blood pressure was 142/90. The nurse's entry in the record indicates that decedent was then not responding to verbal stimulation, and, possibly, not to physical stimulation. The nurse was concerned and notified the nursing supervisor, who checked decedent. At about 9:40 p.m., Dr. Lund was notified and he arrived at the hospital shortly thereafter. Dr. Lund checked decedent at about 10:15 p.m. He suspected the possibility of an internal hemorrhage, although this is unusual where blood pressure is rising. There is evidence that ordinarily where there is internal hemorrhage, the blood pressure drops.[2]

In order to check for hemorrhage, at 10:50 p.m. Dr. Lund ordered an immediate ("stat") complete blood count. Although the lab technician normally goes home at 11 p.m., neither the hospital nor the doctor phoned the lab about the "stat" aspect of the blood count ordered. If notified, the lab technician would have remained at the hospital for the blood count. As a result, the "on call" lab technician had to come to the hospital to run it. In his 10:50 p.m. orders, Dr. Lund also ordered that decedent's vital signs be monitored every half hour through the night because he wanted to know immediately of any change indicating hemorrhage. He also ordered that decedent's I.V. be kept open in case she needed a transfusion. Because he felt that there was nothing more for him to do until the results of the blood count were known and because he lived only 5 to 10 minutes from the hospital, Dr. Lund went home after rechecking decedent.

The nurse took decedent's blood pressure at 11:45 p.m. (55 minutes after the order to check it every half hour). Decedent's blood pressure had risen to 160/90. She had stiffened arms and legs and her right hand was tightly clenched. Instead of telephoning the doctor, which she could have done, the nurse called the night supervisor who came and looked at decedent. The night supervisor realized from the chart and from seeing decedent that the condition was critical. At 12:15 a.m. on July 12, 1967 (about half an hour after the critical signs had been observed by the first nurse), she phoned Dr. Lund and then told him both of decedent's condition and that the blood count showed internal bleeding. Dr. Lund ordered that

[2]George Gordon, M.D., testified that where a basically healthy person such as decedent is bleeding internally, blood pressure may not drop because hormones are produced which constrict the blood vessels and keep the blood pressure up. The body does this in order to provide the two essential organs, the brain and the heart, with an adequate blood flow, although the body sacrifices other organs. In such case, there frequently is decreased urinary output over intake due to lessened kidney function. Decedent's urinary output had lessened on the 11th.

decedent be transferred to the intensive care unit. While the night supervisor was on the phone to Dr. Lund, a nurse ran up and said that decedent's blood pressure had jumped to 230/130. By this time it was too late to give her a transfusion because of the danger of cerebral hemorrhage. Although the transfer to the intensive care unit would have taken about five minutes, the nurses testified that decedent was not moved because they were fearful she would regurgitate and aspirate the content en route. The intensive care unit has monitoring equipment and a respirator.

At 12:40 a.m., decedent's breathing ceased and she had a sudden drop in blood pressure. At 12:42 a.m., she had a cardiac arrest. Decedent was taken to the intensive care unit at 1:05 a.m. She was pronounced dead at 4:45 p.m. The autopsy revealed that the main cause of decedent's death was continuous hemorrhage at or about the operative site, with a blood loss of about 1,000 cc.

The following questions are posed:

I. ■■■ Did the trial court err in refusing a conditional res ipsa loquitur instruction against respondents Dr. Lund and Los Gatos-Saratoga Community Hospital for its post-operative care and treatment of decedent?

■■■ In order for the doctrine of res ipsa loquitur to apply three conditions must be met: The injury must be of a nature which ordinarily does not occur in the absence of someone's negligence; the injury must have been caused by an agency or instrumentality in the control of a defendant; and the injury must not have been due to any voluntary action or contribution on the part of plaintiff.[3] (*Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 788 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717]; *Tomei* v. *Henning* (1967) 67 Cal.2d 319, 322 [62 Cal.Rptr. 9, 431 P.2d 633]; *Seneris* v. *Haas* (1955) 45 Cal.2d 811, 823 [291 P.2d 915, 53 A.L.R.2d 124]; *Ybarra* v. *Spangard* (1944) 25 Cal.2d 486, 489 [154 P.2d 687, 162 A.L.R. 1258].) In codifying the conditions wherein a conditional res ipsa loquitur instruction must be given, the Legislature in section 646 of the Evidence Code characterized the doctrine as a "presumption affecting the burden of producing evidence" the effect of which is informatively discussed in Witkin's California Evidence (2d ed. 1966) section 221, pages 200-201, section 264, pages 227-228. In effect, when the enumerated conditions are established, the plaintiff is protected from a defense directed verdict and the applied doctrine will support a finding of negligence.

---

[3]We have not used the reduction to two elements found in the later cases because the second element thereof almost invariably includes the second and third elements as stated in the earlier cases as well as in Prosser's influential text, Torts (4th ed.) Negligence, page 218 et seq.

■ However, when a defendant, against whom the doctrine applies, produces evidence that he was not negligent or that, if he was, such negligence was not a proximate cause of plaintiff's injury, then a plaintiff is entitled under the mandate of said section 646 to a conditional res ipsa loquitur instruction. (*Meier* v. *Ross General Hospital* (1968) 69 Cal.2d 420, 424 [71 Cal.Rptr. 903, 445 P.2d 519]; *Clark* v. *Gibbons* (1967) 66 Cal.2d 399, 412 [58 Cal.Rptr. 125, 426 P.2d 525]; *Quintal* v. *Laurel Grove Hospital* (1964) 62 Cal.2d 154, 163-164 [41 Cal.Rptr. 577, 397 P.2d 161]; *Davis* v. *Memorial Hospital* (1962) 58 Cal.2d 815, 817-819 [26 Cal.Rptr. 633, 376 P.2d 561].) The trial judge must, upon request, inform the jury that if it finds facts giving rise to the doctrine are established it may find for the plaintiff but that, after weighing all of the evidence and drawing such inferences therefrom as it believes to be warranted, unless it believes that it is more probable than not that the injury was caused by a defendant's negligence, it should find for the defendant.

Both Evidence Code section 646 and BAJI instructions numbers 6.35 and 4.02 in explaining conditional res ipsa loquitur are phrased in terms of when the jury may or may not draw an inference that negligent conduct on the part of a defendant, not specifically proved except by resort to the doctrine, existed and was a proximate cause of the injury. The test then is that of balancing the probabilities of negligence as a factor of causation in the particular circumstances shown by the evidence. Basically, these instructions were requested by appellants against both doctor and hospital respondents for the surgery and post-operative care rendered to decedent by them.

Policy considerations have been noted that favor application of the doctrine in medical malpractice cases because defendants therein are in a position of special responsibility to their patients and the latter are usually completely dependent upon the medical profession for treatment and care. The doctrine thus protects the dependent party from unexplained injury at the hands of one in whom, of compelling necessity, he has reposed complete trust. (*Bardessono* v. *Michels, supra,* 3 Cal.3d at p. 789; *Salgo* v. *Leland Stanford etc. Bd. Trustees* (1957) 154 Cal.App.2d 560, 568-569 [317 P.2d 170].)

■ In the present case, there was sufficient evidence to show that the injury was of a nature that ordinarily does not occur in the absence of negligence. ■ Although res ipsa loquitur does not apply where the balance of probabilities in favor of negligence cannot be found, it may apply where the cause of the injury is a mystery, if there is a reasonable

and logical inference that defendant was negligent and that such negligence caused the injury. (*Clark* v. *Gibbons, supra,* 66 Cal.2d at p. 409; *Quintal* v. *Laurel Grove Hospital, supra,* 62 Cal.2d at p. 165.) Each case must be determined on its own facts. (*Ibid.*) In making such determination, the courts rely on expert testimony and on common knowledge, depending on the complexity of the medical diagnosis or procedures involved in the circumstances of the case. (See *Bardessono* v. *Michels, supra,* 3 Cal.3d at pp. 789-793.)

There was evidence that the operation was commonplace for an obstetrics-gynecology specialist, and death is very uncommon after such an operation. This does not itself prove that the death was probably caused by negligence. (*Schnear* v. *Boldrey* (1971) 22 Cal.App.3d 478, 484-485 [99 Cal.Rptr. 404]; *Clemens* v. *Regents of University of California* (1970) 8 Cal.App.3d 1, 11 [87 Cal.Rptr. 108].) Appellants, however, may meet their burden by showing that (1) the injury is a known risk which rarely occurs and (2) there were specific acts by a defendant which indicate negligence, but which in themselves may not constitute a preponderance of evidence to establish either lack of due care or proximate causation. (*Clark* v. *Gibbons, supra,* 66 Cal.2d at p. 412; *Quintal* v. *Laurel Grove Hospital, supra,* 62 Cal.2d at p. 164.)

■ As to the hospital, there was expert testimony of a large number of violations of the required standard of care. The major ones were as follows: The hospital should have but did not follow Dr. Lund's 10:50 p.m. orders. Although decedent's blood pressure was to be taken every half hour, it was not taken until 55 minutes had elapsed. The blood count, which could have been run in 20 minutes if the hospital had phoned the "stat" order to the lab technician at the time it was given, took one hour and 25 minutes. It was the hospital's responsibility. Dr. Lund was not notified at 11:45 that decedent's condition had definitely worsened. Nurses should notify the doctor of any significant change or unresponsiveness. Instead of calling Dr. Lund, as even he thought she should have done, the nurse notified only the night supervisor. By the time Dr. Lund was notified, one half hour later, decedent's blood pressure jumped to such a level that it would have been impossible to give her a transfusion without running a high risk of cerebral hemorrhage. Also, the intake and output chart upon which physicians rely was inaccurately kept. Decedent was not transferred to the intensive care unit until some 45 minutes after the doctor had so ordered. Thus, appellants have met the burden of showing specific acts by the respondent hospital which indicate negligence, although proximate causation of any single act may not have been proved and evidence was

introduced to show that the cardiac arrest might have been due to other causes. Appellants were thus entitled to a conditional res ipsa loquitur instruction against respondent hospital, and the jury could have relied thereon in determining proximate cause.

Respondent hospital contends that the instruction was properly refused because there was no expert testimony introduced showing these factors caused or contributed to decedent's cardiac arrest. Respondent relies on the language of *Seneris* v. *Haas, supra,* 45 Cal.2d 811, at page 829, that points to the necessity of expert evidence regarding proximate cause in the situation there under consideration. Later decisions have not followed *Seneris* on this point and a more recent statement of the law is found in *Quintal* v. *Laurel Grove Hospital, supra,* 62 Cal.2d at page 166, and *Davis* v. *Memorial Hospital* (1962) 58 Cal.2d 815, 817 [26 Cal.Rptr. 633, 376 P.2d 561], to the effect that when a defendant's negligence is one of several possible causes reasonably inferable from the evidence, the choice or rejection of the inference must be left to the jury under conditional res ipsa loquitur instructions. Also, Evidence Code section 646 clearly allows the jury to find proximate cause in circumstances similar to those shown by the evidence in the case before us. For example, the jury could have believed that if Dr. Lund had been notified (1) of decedent's change for the worse at 11:45 when her blood pressure was 160/90 and she could still have been transfused, or (2) if he had been immediately informed of the blood count results indicating internal bleeding, or, better, if the result was known at 11:15 p.m. (there is testimony that it would have been if the order had been immediately placed with the laboratory) instead of an hour later, a transfusion might have saved her life. The jury was accordingly entitled to determine the probabilities under a conditional res ipsa loquitur instruction.

As to the doctor: We need not resolve the close question that exists upon the present record especially as to post-operative care. (In view of his patient's condition at the time he suspected the possibility of internal bleeding there may be a question as to whether he used due diligence to determine the actuality or to see that his "stat" order was complied with in 20 minutes instead of more than an hour's time.) Because, as discussed below, appellants were improperly limited in their attempt to adduce evidence as to the standard of care applicable to gynecological procedures and care, the case will have to be retried. The propriety of a conditional res ipsa instruction against the doctor will have to be determined in accordance with the general rules discussed herein as they will apply to the record on retrial.

II. ■■ Did the trial court improperly limit the testimony of one Louis Lichtenstein, M.D.?

In refusing to allow Dr. Lichtenstein, a pathologist, to testify on the standard of care of a gynecological surgeon, the trial judge apparently relied on the following language in *Huffman* v. *Lindquist* (1951) 37 Cal.2d 465, 478 [234 P.2d 34, 29 A.L.R.2d 485], that, although the witness who testifies as to the standard against which a physician's acts are measured "must have had basic educational and professional training as a general foundation for his testimony, . . . it is a practical knowledge of what is usually and customarily done by physicians under circumstances similar to those which confronted the defendant charged with malpractice that is of controlling importance in determining competency of the expert to testify . . . ." This passage was quoted by counsel in urging his objection. The passage immediately follows a discussion of "occupational experience" as requisite to expert qualifications that was drawn from *Sinz* v. *Owens* (1949) 33 Cal.2d 749, at page 753 [205 P.2d 3, 8 A.L.R.2d 757]. The passage is strongly criticized in both Justice Carter's and Schauer's dissenting opinions. Whether this was the basis of Chief Justice Traynor's concurring in the judgment rather than the opinion cannot be determined. Later in *Thompson* v. *City of Long Beach* (1953) 41 Cal.2d 235 [259 P.2d 649], wherein the issue was whether or not appellant's visual deficiencies after cataract surgery incapacitated her from performing stenographic duties, the Supreme Court, upon conflicting adverse testimony of general practitioners and favorable testimony of opthalmologists, upheld the civil service board's order dismissing appellant from her employment. The court said, on page 241, "While they were general practitioners rather than eye specialists, this fact did not affect their [the general practitioners'] competency but only went to the weight to be accorded to their testimony." The court noted that the standard of care required of eye specialists was not involved and therefore the rule of *Huffman* did not apply. Again, Justice Carter, in a concurring opinion, points out the inconsistency between his interpretation of the *Huffman* rule and the holding of the court in the case before it.

Subsequently, in *Seneris* v. *Haas* (1955) 45 Cal.2d 811, at page 833, the Supreme Court said, per Justice Carter, " 'To qualify a witness as a medical expert it must be shown that the witness (1) has the required professional knowledge, learning and skill of the subject under inquiry sufficient to qualify him to speak with authority on the subject, and (2) is familiar with the standards required of physicians under similar circumstances. [Citations.] Where a witness has disclosed sufficient knowl-

edge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than its admissibility.' " In this decision, Justice Carter, with a nod to *Huffman*, notes, at page 832, that the pathologist's testimony was not offered (in *Seneris*) "as expert evidence on the proper and requisite degree of skill and care used by practicing physicians in the community." It is idle to conjecture whether this reference was inserted in order to secure a majority concurrence for the opinion but it may be noted that three of the justices who joined in the *Huffman* decision joined also in *Seneris* but the author of *Huffman* concurred only in the judgment. Be that as it may, the *Huffman* language is subject to the overly stringent interpretation accepted by the trial judge in the case at hand to require actual "occupational experience" in the practice of a particular specialty before a physician can testify as to the standard of care applicable thereto. We do not believe that the law requires board certification and practice of a specialty as a requisite if knowledge and familiarity with such standards are otherwise established.

■ The qualification of an expert is ordinarily a matter addressed to the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless a clear abuse of discretion is shown. "The determinative test as to whether the trial court properly exercised its discretion is whether the witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury." (*Seneris* v. *Haas, supra,* at p. 833.)

■ Although Dr. Lichtenstein was not a gynecologist or surgeon he frequently "scrubbed in" in the operating room and advised surgeons, including gynecologists, what to do. He is clinical professor of pathology at University of California Medical School in San Francisco. He had made rounds and participated with gynecologists on tissue committee reviews of hysterectomies. He had examined suture lines for separation and infection. He had examined the slides in the particular case. He had had extensive experience in surgical autopsies and had examined hydrosalpinxes and over 5,000 uteruses, both after death and during operations. Also, he had examined post-surgery cases to determine the cause of hemorrhage. Within the areas of knowledge gained by this experience and observation, it was error to exclude his opinion testimony and to refuse him the opportunity to answer hypothetical questions relating thereto. The objection went to weight and not to competency. ■ We hold that where a duly licensed and practicing physician has gained knowledge of the standard of care applicable to a specialty in which he is not directly engaged but as to which he has an opinion based upon education, experience, observation or association with that specialty, his opinion is competent.

Again, policy considerations support the admission of such testimony. This is an era of increasingly narrowing areas of medical specialization. To require occupational experience in a particular specialty and to reject knowledge gained by close professional contact with and observation of the practice of such specialty, as was shown in the present case, unduly limits the possibility of securing evidence from members of the medical profession. It would also make it impossible for professors in medical schools and for heads of departments in hospitals who no longer actively practice to testify in areas in which it may be presumed that, as educators and administrators, they may have expert knowledge that may be relevant to issues confronting a court in malpractice cases.

Plaintiffs were unable to get a gynecologist to testify. The reluctance of physicians to testify against each other has been noted in *Huffman* v. *Lindquist, supra,* 37 Cal.2d 465 (Carter dissent, pp. 483-484), and *Berkey* v. *Anderson* (1969) 1 Cal.App.3d 790, 798 [82 Cal.Rptr. 67], as reason for the extension of res ipsa loquitur in medical malpractice cases. The same considerations would apply if actual and primary occupational experience in the precise field of any medical specialty were held to be the sole criteria qualifying an expert witness to testify in a case involving that specialty. A court would then be in a position wherein its power would have to be exercised to prevent a plaintiff from proving a case against a specialist unless he was able to produce another specialist to testify adversely to his fellow specialist's interest.

Whether or not, upon retrial in the instant case, the testimony will require conditional res ipsa loquitur instructions against the doctor can be determined only after Dr. Lichtenstein has testified. On retrial the standards which we have discussed in answer to question 1, *supra,* will apply.

III. Did the trial court err in refusing an amendment to the complaint and instructions on the issue of "informed consent"?

At the outset of the trial, appellants submitted a proposed amendment to the complaint alleging that decedent had not given her informed consent to the surgery. The trial court refused to permit such amendment. Appellants, however, introduced evidence on this issue. When they rested their case, appellants made a motion to amend the complaint to conform to proof pertaining to the issue of lack of informed consent. The motion was denied. The trial court also refused to give instructions submitted on the issue.

Appellants' proposed theories on the lack of informed consent were addressed to both the battery and negligence causes of action. The Supreme

Court has recently decided that California follows the view that, when an undisclosed potential complication results, the occurrence of which was not an integral part of the treatment procedure but merely a known risk, this should be deemed to be negligence; and it is only when a doctor obtains consent from the patient to perform one type of treatment and thereafter performs a substantially different treatment for which consent was not obtained that there is a case of battery. (*Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 239-241 [104 Cal.Rptr. 505, 502 P.2d 1].) On the present record the case clearly falls within the negligence category. At the time of the motion to amend, any possible battery cause was barred by limitations. (Code Civ. Proc., § 340.5.) Because evidence was presented at trial on this issue as to negligence, the trial court's refusal to permit amendment did not prejudice appellants. Because the issue may arise upon retrial, we note that the issue being provable under a negligence cause of action, if appellants again move to amend in order to clarify their pleadings, the question should be reexamined in the light of *Rainer* v. *Community Memorial Hosp.* (1971) 18 Cal.App.3d 240, 256-257 [95 Cal. Rptr. 901].

Because the action will have to be retried, we do not discuss appellants' contentions that the trial court committed prejudicial error by restricting their cross-examination of several defense witnesses and by excluding certain rebuttal testimony.

The judgment is reversed.

Devine, P. J., and Bray, J.,* concurred.

A petition for a rehearing was denied May 18, 1973, and the opinion was modified to read as printed above. The petition of respondent Los Gatos-Saratoga Community Hospital for a hearing by the Supreme Court was denied June 13, 1973.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.