Filed 1/13/15  Hooks v. City of Los Angeles CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ALVIN HOOKS,<br><br>　　　　Plaintiff and Appellant,<br><br>　　v.<br><br>CITY OF LOS ANGELES,<br><br>　　　　Defendant and Respondent. | B248526<br><br>(Los Angeles County<br>Super. Ct. No. BC449489) |

　　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Richard E. Rico, Judge.  Affirmed.

　　　　Mason & Associates, Reginald P. Mason; Law Office of Robert M. Ball and Robert M. Ball for Plaintiff and Appellant.

　　　　Michael N. Feuer, City Attorney, Amy Jo Field and Lisa S. Berger, Deputy City Attorneys, for Defendant and Respondent.

＊＊＊＊＊＊＊＊＊＊

The family of Stephanie Hooks sued the City of Los Angeles (City) for wrongful death, claiming that paramedics were negligent and that the negligence caused her untimely death. The trial court granted judgment of nonsuit, finding no evidence of the breach of a standard of care, gross negligence, or causation. Mrs. Hooks's husband Alvin Hooks appeals from the judgment.[1] We affirm.

## FACTS AND PROCEDURE

On February 21, 2009, Stephanie Hooks (Mrs. Hooks) was experiencing shortness of breath. Her daughter called 911 to summon aid. The requested ambulance was overdue at the Hooks residence, and members of the family described Mrs. Hooks's shortness of breath over the phone with a 911 dispatcher. The family also expressed frustration that it was taking the ambulance so long to arrive. The dispatcher repeated that the ambulance was on its way. When paramedics arrived, they immediately asked Alvin Hooks about her health. Mrs. Hooks told the paramedics that she could not breathe, and she appeared to be gasping for air.

Paramedics did not administer oxygen. Although they took Mrs. Hooks's blood pressure, they did not administer other tests including an electrocardiogram (EKG) and pulse oximeter. Paramedics dropped Mrs. Hooks as they carried her out of her house. Paramedics transported her to a hospital, where two days later Mrs. Hooks was declared brain dead.

Dr. Randy Hawkins, a physician licensed in internal medicine and pulmonary and critical care testified for appellant. Dr. Hawkins had practiced for 27 years, and had treated hundreds of pulmonary embolism cases. Pulmonary embolisms are generally caused by blood clots that block circulation of blood through the lungs. Dr. Hawkins reviewed the 911 call, the paramedics' report and Mrs. Hooks's medical records after she was admitted to the hospital on February 21, 2009. Based on his review of those records, he concluded that "she was quite ill." According to Dr. Hawkins, Mrs. Hooks was in

---

[1]    This court issued an order July 31, 2013, reinstating the appeal as to Alvin Hooks only. Mrs. Hooks's mother and daughter were also plaintiffs in the trial court.

2

"severe respiratory distress" at the time of the 911 call. The respiration rate marked on the paramedics' report was normal and the blood pressure was near normal. While the pulse also could have been normal, Dr. Hawkins could not assess it because he had no EKG results. But Dr. Hawkins believed that the paramedics' report was inaccurate based on what he heard on the 911 tape.

Dr. Hawkins further testified that paramedics did not record Mrs. Hooks's oxygen saturation, which would have indicated whether it was necessary to immediately place her on oxygen. He also testified that "many people are short of breath, but not all have low oxygen levels." According to Dr. Hawkins, if a person had difficulty breathing, oxygen would help and administering fluids may help. Hawkins testified he could not "get a true indication of [Mrs. Hooks's] condition" because paramedics had not completed an EKG or a pulse oximetry reading, which would have identified her oxygen level. According to him, paramedics should have taken those tests.

Dr. Hawkins was not permitted to testify regarding whether he believed the Glascow Coma Scale result of 15 was accurate. He testified that was a test that measured an individual's alertness and neurological state. The court concluded that Dr. Hawkins could not testify as to the accuracy of the result because he was not there when the test was conducted and he was relying on information not available to the paramedics who were present.

Dr. Hawkins opined that Mrs. Hooks's cause of death was a massive stroke. He testified that oxygen would have helped a patient that was having difficulty breathing. The court sustained an objection to a question by appellant's counsel whether the failure to administer oxygen contributed to Mrs. Hooks's death.

Dr. Hawkins was not permitted to testify as to the paramedics' standard of care. On voir dire, Dr. Hawkins acknowledged that he did not know the requirements for paramedics. Dr. Hawkins testified that he did not know the requirements for becoming a paramedic. He did not know what subjects a paramedic learned for certification. Dr. Hawkins did not know the standard of care for completing a paramedic form but "suspect[ed] it exist[ed]." Dr. Hawkins explained that he was not prepared to testify as

3

an expert on paramedics but was prepared to testify as an expert on pulmonary embolisms.

The trial court granted the City's motion for a nonsuit. The court concluded there was no evidence the paramedics breached the standard of care, there was no evidence of gross negligence, and there was no evidence that anything the paramedics did or failed to do caused Mrs. Hooks's death. The court subsequently denied appellant's motion for a new trial. This appeal followed.

## DISCUSSION

"We review a grant of nonsuit de novo, applying the same standard governing the trial court. [Citation.] As the Supreme Court has explained, 'A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. [Citation.] "In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded."' [Citation.] Consequently, the reviewing court 'will not sustain the judgment "'unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff, a judgment for the defendant is required as a matter of law.'"'" (*Brand v. Hyundai Motor America* (2014) 226 Cal.App.4th 1538, 1544-1545.)

## 1. Appellant Was Required to Show Gross Negligence

To hold the City liable for the actions or inactions of the paramedics, appellant would have to show the paramedics were grossly negligent. Our Supreme Court concluded that a plaintiff must show bad faith or gross negligence to overcome the immunity under Health and Safety Code section 1799.107.[2] (*Eastburn v. Regional Fire*

---

[2] Health and Safety Code section 1799.107 provides:

"(a) The Legislature finds and declares that a threat to the public health and safety exists whenever there is a need for emergency services and that public entities and

4

*Protection Authority* (2003) 31 Cal.4th 1175, 1185 (*Eastburn*).) Gross negligence is defined as """"the want of even scant care or an extreme departure from the ordinary standard of conduct."""" (*Id*. at pp. 1185-1186.)

Appellant's principle argument that the dispatch delays constituted "ordinary negligence" ignores our high court's ruling in *Eastburn*. The sole authority appellant relies upon—*Ma v. City and County of San Francisco* (2002) 95 Cal.App.4th 488—has been overruled by our high court in *Eastburn*. Specifically, the *Eastburn* court explained: "We think that *Ma* erred in concluding that Civil Code section 1714, and the common law principles it codified, were alone sufficient bases for imposing *direct* tort liability on a public entity." (*Eastburn, supra*, 31 Cal.4th at p. 1183.) "As for a public agency's *vicarious* liability based on its own employee's act or omission . . . , we believe the *Ma*

---

emergency rescue personnel should be encouraged to provide emergency services. To that end, a qualified immunity from liability shall be provided for public entities and emergency rescue personnel providing emergency services.

"(b) Except as provided in Article 1 (commencing with Section 17000) of Chapter 1 of Division 9 of the Vehicle Code, neither a public entity nor emergency rescue personnel shall be liable for any injury caused by an action taken by the emergency rescue personnel acting within the scope of their employment to provide emergency services, unless the action taken was performed in bad faith or in a grossly negligent manner.

"(c) For purposes of this section, it shall be presumed that the action taken when providing emergency services was performed in good faith and without gross negligence. This presumption shall be one affecting the burden of proof.

"(d) For purposes of this section, 'emergency rescue personnel' means any person who is an officer, employee, or member of a fire department or fire protection or firefighting agency of the federal government, the State of California, a city, county, city and county, district, or other public or municipal corporation or political subdivision of this state, or of a private fire department, whether that person is a volunteer or partly paid or fully paid, while he or she is actually engaged in providing emergency services as defined by subdivision (e).

"(e) For purposes of this section, 'emergency services' includes, but is not limited to, first aid and medical services, rescue procedures and transportation, or other related activities necessary to insure the health or safety of a person in imminent peril."

5

court also erred in concluding that . . . the city and its 911 dispatchers lacked qualified immunity under Health and Safety Code section 1799.107." (*Id*. at p. 1184.)

## 2. *In Addition to Gross Negligence, Appellant Was Required to Show Causation*

It is undisputed that to prove his wrongful death cause of action appellant was required to show that the breach of a standard of care *caused* the death of Mrs. Hooks. (*Johnson v. Prasad* (2014) 224 Cal.App.4th 74, 78 [elements of cause of action for negligence include causation].) While appellant identifies several alleged breaches involving the failure to take tests—there was no evidence that the failure to take any of those tests caused Mrs. Hooks's death. No witness testified as to any link between the test and her death caused by a massive stroke. Because there was no evidence on causation with respect to the bulk of appellant's alleged breaches, we need not focus on whether those breaches fell below the standard of care.

The only alleged breach appellant argues caused Mrs. Hooks's death is the failure to administer oxygen. Dr. Hawkins testified that giving oxygen would have assisted Mrs. Hooks. Appellant argues that he established a link between the lack of oxygen and Mrs. Hooks's brain death. Appellant's argument is as follows: "The trial transcript establishes that Plaintiffs established causation as between the administration of oxygen and Mrs. Hooks' condition. . . . Defendant['s] reference to another part of the transcript only shows that there are conflicting facts as to the issue of causation. Nevertheless, Plaintiffs reserve their right to argue more fully said issue during the hearing in this matter. Moreover, Dr. Hawkins['s] testimony established that there was a causal connection between Mrs. Hooks not getting oxygen and her brain death."

We find no record evidence that the paramedics' failure to provide oxygen contributed to Mrs. Hooks death. Nevertheless, it appears that appellant's counsel attempted to elicit such testimony but objections to the proposed testimony were sustained. For purposes of this appeal, we assume Dr. Hawkins would have testified that the failure to administer oxygen caused Mrs. Hooks's death and conclude that Dr. Hawkins was qualified to opine on the cause of Mrs. Hooks's death. Dr. Hawkins was qualified as a medical expert with over 27 years' experience, and his experience as a

6

pulmonologist was directly relevant to his proposed opinion. In *Wright*, a physician was permitted to testify that if oxygen and an IV had been administered, the decedent would have lived. (*Wright v. City of Los Angeles* (1990) 219 Cal.App.3d 318, 348 (*Wright*).) Dr. Hawkins should have been permitted to testify similarly.

### 3. Dr. Hawkins Was Not Qualified to Testify as to the Standard of Care for Paramedics

Although we assume appellant demonstrated that the failure to provide oxygen caused Mrs. Hooks's death, there was no evidence that such failure constituted gross negligence. Although Dr. Hawkins was qualified to testify as to whether oxygen would have helped prevent the stroke that caused Mrs. Hooks's death, he was not qualified to testify as to the standard of care for paramedics. Appellant's argument that he was so qualified is not persuasive.

In *Wright, supra*, 219 Cal.App.3d 318, the court reversed nonsuit after finding a nurse's testimony sufficient to support liability for a paramedic's negligence. The nurse had written about paramedics, was involved in professional committees dealing with paramedics, and had evaluated paramedics. (*Id*. at p. 338.) She testified that she was familiar with the standards of care for paramedics. (*Ibid*.)

In contrast to *Wright*, here there was no testimony by a person knowledgeable about the standard of care as to paramedics to testify regarding a breach of that standard of care. Dr. Hawkins was not qualified to testify about the standard of care for paramedics because he testified he did not know the requirements for a paramedic. Because Dr. Hawkins was not familiar with the standard of care for a paramedic, appellant's argument that he should have been allowed to testify regarding other related tests paramedics should have conducted lack merit.

Neither *Cline v. Lund* (1973) 31 Cal.App.3d 755 nor *Alef v. Alta Bates Hospital* (1992) 5 Cal.App.4th 208 compels a different result. In *Cline*, the court held that when "a duly licensed and practicing physician has gained knowledge of the standard of care applicable to a specialty in which he is not directly engaged but as to which he has an opinion based upon education, experience, observation or association with that specialty,

his opinion is competent." (*Cline*, at p. 766.) That rule is inapplicable here because Dr. Hawkins testified that he was not knowledgeable as to the standard of care for paramedics. In *Alef*, the court reversed a judgment of nonsuit. The plaintiff had alleged that the nurses breached the standard of care causing injury during birth. (*Alef*, at p. 214.) The court explained that "a nurse's conduct must not be measured by the standard of care required of a physician or surgeon, but by that of other nurses in the same or similar locality and under similar circumstances." (*Id*. at p. 215.) A doctor testified as to the standard of care for a task that could be performed by either a physician or a nurse. (*Ibid*.) The doctor therefore was familiar with the requirements for nurses. (*Ibid*.) In contrast here, there was no evidence Dr. Hawkins was familiar with the requirements for a paramedic to administer oxygen in the field. The issue is not whether Dr. Hawkins was "qualified to administer oxygen" but whether he was qualified to opine on the standard of care for a paramedic to do so. If there had been evidence that the standard was the same for the paramedic as for the physician then *Alef* would be helpful to appellant.

Finally, appellant argues that the trial court conceded Dr. Hawkins was an expert on paramedic care. We do not agree with that characterization. More importantly, following our independent review of the record, we find no evidence Hawkins was an expert on paramedic care. He expressly testified that he was not aware of requirements for paramedics.

### 4. *Gross Negligence Cannot Be Resolved by Common Experience*

Appellant argues that jurors could infer from their common experience that paramedics should have given Mrs. Hooks oxygen because that determination is "'"within the common knowledge of the layman."'" (*Willard v. Hagemeister* (1981) 121 Cal.App.3d 406, 412.) Appellant cites no authority for the proposition that the standard of care of a paramedic is a matter of common experience, but instead analogizes to the concept of res ipsa loquitur. That doctrine provides: "'"The standard of care against which the acts of a physician are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony [citations], unless the conduct required by the particular

circumstances is within the common knowledge of the layman." [Citations.]'
[Citations.] The 'common knowledge' exception is principally limited to situations in
which the plaintiff can invoke the doctrine of res ipsa loquitur, i.e., when a layperson 'is
able to say as a matter of common knowledge and observation that the consequences of
professional treatment were not such as ordinarily would have followed if due care had
been exercised.' [Citation.] The classic example, of course, is the X-ray revealing a
scalpel left in the patient's body following surgery." (*Flowers v. Torrance Memorial
Hospital Medical Center* (1994) 8 Cal.4th 992, 1001, fn. omitted.)

We do not agree with appellant's contention that a layperson can determine based
on common knowledge that it was grossly negligent not to administer oxygen when
Mrs. Hooks presented with difficulty breathing. The treatment for someone with
shortness of breath is not a matter within common knowledge. It is not akin to something
that would not happen absent negligence such as leaving a scalpel inside a patient's body.
Observing the X-ray of a scalpel in the body is indicative of negligence. In contrast the
relationship between administering oxygen and suffering from a stroke is not apparent
based on common knowledge. Moreover, appellant was required to show that the failure
to administer oxygen constituted an extreme departure from the ordinary standard of care,
a determination that cannot be made without knowing the standard of care.

### 5. New Trial Motion

In connection with their new trial motion, appellant presented evidence of a
manual that a paramedic should know how to administer oxygen. Putting aside whether
the court erred in denying appellant's request for judicial notice of the document which
was not part of trial, there was no evidence that the paramedics did not know how to
administer oxygen. The issue was whether the failure to administer oxygen constituted
gross negligence. The manual appellant sought to introduce does not address that
question.

### 6. The Court Did Not Improperly Weigh the Evidence

The trial court stated that the evidence did not show gross negligence absent
expert testimony. That statement does not reflect on the credibility of appellant's

9

evidence. Instead it is a legal determination that the evidence was insufficient as a matter of law absent expert testimony.[3]

In any event, we have independently reviewed the record and conclude as the trial court did that interpreting the evidence in the light most favorable to plaintiff, there was insufficient evidence to show gross negligence. As explained, the only alleged breach appellant argues could have caused Mrs. Hooks's death was the failure to administer oxygen. Appellant presented no evidence that such failure constituted "'"'"the want of even scant care or an extreme departure from the ordinary standard of conduct."'"'" (*Eastburn, supra*, 31 Cal.4th at pp. 1185-1186.) The trial court therefore properly granted nonsuit.

## DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal.


FLIER, J.

WE CONCUR:


BIGELOW, P. J.


GRIMES, J.

---

[3]    In several footnotes, appellant suggests that the court improperly interrupted his counsel's argument. Appellant also suggests that the court interrupted his counsel because of the race of his counsel. While the court attempted to stop counsel from repeating arguments made in his written motion for new trial, there is no record support for appellant's suggestion the court committed misconduct.