Filed 5/13/25  Frabotta v. Rashid CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DEBBIE FRABOTTA,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>SAQIB RASHID,<br><br>Defendant and Respondent. | F088405<br><br>(Super. Ct. No. 22CECG02513)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jeffrey Y. Hamilton, Jr., Judge.

Swanson O'Dell and Seth N. O'Dell for Plaintiff and Appellant.

Schaeffer Cota Rosen, James C. Schaeffer and Jennifer B. Saccomano for Defendant and Respondent.

-ooOoo-

Debbie Frabotta brought this wrongful death lawsuit against the hospital and doctors who treated her husband, Michael Frabotta, alleging their medical malpractice led

to his death.[1]  Debbie appeals from a judgment entered in favor of one of her husband's physicians, Saqib Rashid, M.D. (Rashid), after the trial court granted Rashid's motion for summary judgment.  The trial court granted summary judgment after excluding the declaration of Debbie's expert on the standard of care and causation because the expert did not have sufficient experience and was unlicensed when the alleged malpractice occurred.

On appeal, Debbie argues her expert witness was qualified to provide an opinion about the standard of care to which Rashid was held and the expert's declaration, if admitted, would have established a triable issue of fact on the standard of care and causation.  We agree with Debbie.  Therefore, we reverse and remand with directions that the trial court deny summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 29, 2021, Michael was transferred from the Fresno VA hospital to Saint Agnes Medical Center (Saint Agnes) following an eight-day history of left lower extremity paresthesia and pain and coolness to the left foot.  Medical imaging performed at the VA hospital showed that Michael had a left lower extremity thrombus, or blood clot, with a partial/complete occlusion.  Michael was transferred to Saint Agnes to receive thrombolysis of the occlusion.

Michael arrived at Saint Agnes by ambulance at 4:28 p.m. and was seen by interventional radiologist Brian Boa-Yen Ng., M.D., who performed a catheter-directed thrombolysis that delivered tPA[2] directly into the thrombus.  The catheter was to remain

---

[1]    Because appellant and her husband share the same last name, we refer to them by their first names for ease of reference.  No disrespect is intended.

[2]    tPA, an abbreviation for tissue plasminogen activator, is an anticlotting enzyme used to dissolve blood clots.  (See Dictionary.com (2025) <https://www.dictionary.com/browse/tpa> [as of May 13, 2025], <https://www.dictionary.com/browse/tissue-plasminogen-activator> [as of May 13, 2025].)

inserted for 24 hours to deliver tPA and an angiogram was planned for the next day to determine if the clot had dissolved or passed. Ng ordered that Michael receive nothing by mouth (NPO) after midnight on June 29.

Michael was admitted to the intensive care unit (ICU), where Juan G. Chavez, M.D., was the attending physician. Chavez placed an order at 6:27 p.m. for Michael to have a meal; the records indicated that two dinner trays were delivered to Michael's room—one at 8:00 p.m. and the other at 10:00 p.m., but only the later meal was eaten.

At about 11:20 p.m. on June 29, 2021, ICU nurse Keiona Rose notified the on-call interventional radiologist, Stanley Kim, M.D., about oozing around the catheter sheath delivering the tPA, who responded that was expected due to the tPA drip. Resident Sarbjot Grewal, M.D., and her attending physician, Rashid, were in the ICU for the overnight shift. Grewal initially examined Michael at about 2:30 a.m. on June 30, 2021. There were no abdominal findings—Michael's abdomen was soft, nondistended, and nontender. Grewal noted Michael was seen and the case discussed with Rashid, whose note indicated he also examined the patient and concurred with Grewal's examination and plan.

At 3:30 a.m., Grewal consulted with Kim regarding Michael's oozing at the sheath, who again told Grewal it was expected given the tPA. At 4:15 a.m., Rose notified Grewal that Michael was a little tachycardic with a heart rate of 105, and he was diaphoretic and nauseous. Rose told Grewal she gave Zofran to Michael, but he was still nauseous, and he was bleeding from the sheath. Rose called Kim, who stated the bleeding was expected given the tPA and heparin. In response to Rose's report and Michael's hypotension, Grewal ordered administration of lactated ringers and low-dose Levophed.

Grewal examined Michael again at about 4:30 a.m. and noted there was a change in his abdominal exam—his abdomen was tender to palpation with guarding present. A blood test showed Michael's hemoglobin had decreased from 13.7 to 9.0. Grewal

3.

consulted Kim with this result, who said it was okay to hold the tPA and heparin. Given Michael's abdominal changes and decreased hemoglobin, Grewal ordered a CT of the abdomen/pelvis (CTAP) to rule out a retroperitoneal bleed. Rashid examined Michael and agreed with Grewal's plan.

At 5:06 a.m., Rose informed Grewal that Michael was "persistently bleeding from the sheath site in groin, hypotensive, diaphoretic." At about 6:00 a.m., Michael was taken to have the CTAP performed. Rashid's note explained that normally they would have waited until Michael was more stable, but the benefits of finding the source of the possible bleed outweighed any risk.

When the CTAP without contrast was completed and as Michael was being rolled out of the scanner, he went into "PEA arrest and started bleeding massively from his mouth with copious thick blood clots." Resuscitation efforts were unsuccessful, and Michael was pronounced dead at 7:08 a.m. The results of the CTAP did not show a retroperitoneal bleed or a source of the bleed, although Michael was noted to have blood in his stomach.

An autopsy was performed. The significant findings included extensive aspiration of food particles and foreign materials in the lungs, and moderately extensive visceral bleeding, mostly in the gastrointestinal tract and lungs. Autopsy organ examination demonstrated a moderate amount of bloody fluids in the stomach along with several clusters of blood clots. The small bowel and large intestines were noted to be modestly dilated with bloody fluids and blood clots. The report stated the direct cause of death was unclear but contributing causes could include aspiration, arterial atherosclerosis with peripheral vascular disease, and bleeding disorder.

***This Lawsuit***

Debbie brought this lawsuit against Saint Agnes, Rashid and the other physicians who cared for Michael in August 2022. Although Debbie's complaint and Rashid's

4.

answer are not in the appellate record, the parties agree that the only cause of action alleged against Rashid is one for medical malpractice.

***Rashid's Summary Judgment Motion***

In March 2024, Rashid moved for summary judgment on the grounds that he met the standard of care in his treatment of Michael and his actions or inactions did not cause Michael's death. In support of the motion, Rashid submitted the declaration of Roy Artal, M.D., a pulmonary medicine and critical care physician who was board certified in internal medicine by the American Board of Internal Medicine. Artal also was board certified in critical care medicine between 2002 and 2012.

Artal opined that Rashid met the standard of care in his treatment of Michael and in his supervision of a resident as an attending physician in the ICU, and nothing Rashid did or did not do caused Michael's death. Artal opined it was appropriate to order a CTAP to assess for retroperitoneal bleed or other pathology that would account for the change, and Rashid's decision to take Michael to the CT suite for a CTAP met the standard of care. Artal further opined the standard of care did not require Rashid to order a blood transfusion, as Michael's hemoglobin was not low enough to meet the criteria for blood transfusions, and to a reasonable degree of medical certainty, a blood transfusion would not have prevented Michael's death.

***The Opposition to the Summary Judgment Motion***

In opposition to the summary judgment motion, Debbie argued Rashid failed to meet the standard of care in his treatment of Michael, which contributed to Michael's death. In support of her opposition, Debbie submitted the declaration of Ty Tran, M.D., an emergency medicine physician. Tran graduated from medical school in May 2019, obtained his physician and surgeon license from the Medical Board of California in June 2022, and completed his residency in emergency medicine at Kern Medical Center in June 2023. In November 2023, Tran passed his qualifying exam for the American Board of Emergency Medicine and was eligible for the oral exams to be administered in

2024. Tran declared that based on his education, experience, and training as an emergency medicine physician, he was familiar with the standard of care for critical care physicians in the community and was qualified to render expert opinions in this matter.

Tran stated he was asked to assess whether Rashid complied with the standard of care in his treatment of Michael. Tran reviewed Michael's medical records from Saint Agnes and the Fresno VA hospital, as well as medical documents which were attached as exhibits to his declaration.

Tran opined that because Michael was hemodynamically unstable with risk factors for stress ulcers and physical symptoms of a gastrointestinal bleed, Rashid did not meet the standard of care as he failed to order gastrointestinal prophylaxis, protect Michael's airway, and order a blood transfusion. Tran further opined to a reasonable degree of medical certainty that Rashid's failure to diagnose and properly treat Michael's massive gastrointestinal bleed resulted in his passing in the manner he did.

***Rashid's Reply***

In reply, Rashid contended summary judgment should be granted because Debbie did not offer any competent evidence showing he violated the standard of care as Tran was not qualified to offer opinions on that issue. Rashid submitted a written evidentiary objection to Tran's declaration in its entirety on the grounds it lacked foundation, was conclusory and speculative, and Tran lacked the requisite practical knowledge, training, or skill as a critical care physician to render a standard of care opinion in this matter.

Rashid argued Tran could not offer standard of care opinions concerning a critical care physician in a critical care unit in June 2021, as at that time, Tran had not completed his medical training, he was not licensed to practice medicine, and he lacked any practical knowledge in the area of medicine in which he was offering opinions. Tran had never managed a critical care patient in a critical care department, as he exclusively practiced emergency medicine, completed his residency in that area in June 2023, and never practiced medicine as an attending physician in any critical care department. Rashid

6.

asserted that given this significant lack of experience in any department other than the emergency department, Tran did not possess the requisite education, knowledge, training, and experience to state the standard of care in this instance. Accordingly, Rashid asserted that summary judgment should be entered on his behalf, as Debbie failed to negate the essential element of breach of the standard of care through a qualified medical expert.

***The Trial Court's Ruling***

A hearing on Rashid's motion was held on June 6, 2024. After argument, the trial court took the matter under advisement and ultimately issued an order adopting its tentative ruling granting the motion. The trial court found Artal's declaration was sufficient to shift the burden regarding the standard of care and causation. The trial court sustained Rashid's objections to Tran's declaration in its entirety as lacking foundation, conclusory, and speculative. The trial court explained that Tran practiced exclusively in emergency medicine and completed his residency in emergency medicine in June 2023, but he had not practiced as an attending physician in a critical care department and lacked the requisite experience to render an opinion on the standard of care for such a physician. Moreover, Tran was not licensed to practice medicine at the time of the events giving rise to the lawsuit.

Accordingly, the trial court found Debbie had not met her burden of raising a triable issue of material fact as to both whether Rashid met the standard of care and as to causation. As a result, the trial court granted the motion. Judgment was entered in Rashid's favor on June 14, 2024.

## DISCUSSION

### I. Standard of Review

Summary judgment is proper only if there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subds. (c), (f).) As a moving defendant, Rashid had the initial burden of showing the wrongful death claim based on medical malpractice was without merit by showing one or

more elements cannot be established.  (§ 437c, subd. (p)(2).)  Once Rashid met his initial burden, the burden shifted to Debbie to produce evidence demonstrating the existence of a triable issue of material fact.  (*Ibid.*; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849.)  If Debbie was unable to do so, Rashid was entitled to summary judgment as a matter of law and the motion was properly granted.  (*Kincaid v. Kincaid* (2011) 197 Cal.App.4th 75, 82.)

On appeal, our task is to independently determine whether a triable issue of material fact exists and whether the moving party is entitled to summary judgment as a matter of law.  (*Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1601.)  Although summary judgment rulings are reviewed de novo, we review the trial court's evidentiary rulings for abuse of discretion.  (*Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 122 (*Powell*); *Walker v. Countrywide Home Loans, Inc.* (2002) 98 Cal.App.4th 1158, 1169.)

## II.     Medical Malpractice

"Medical providers must exercise that degree of skill, knowledge, and care ordinarily possessed and exercised by members of their profession under similar circumstances."  (*Powell, supra,* 151 Cal.App.4th at p. 122.)  "Thus, in ' "any medical malpractice action, the plaintiff must establish:  '(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence.' " ' "  (*Ibid.*, citing *Hanson v. Grode* (1999) 76 Cal.App.4th 601, 606.)

Here, Rashid moved for summary judgment on the grounds that Debbie could not establish that he breached the duty of care or caused Michael's death.  The trial court concluded that Rashid satisfied his initial burden of production on these issues, which Debbie does not challenge on appeal.  Thus, the burden shifted to Debbie to raise a triable issue of material fact.  Debbie attempted to do this by presenting Tran's declaration, who

8.

opined Rashid breached the standard of care and caused Michael's death by failing to diagnose and properly treat his massive GI bleed by: (1) failing to consider and order GI prophylaxis; and (2) failing to provide an appropriate resuscitation for hemorrhagic shock including ordering transfusion of blood products and reversal of anticoagulation, and airway management. Because the trial court sustained Rashid's evidentiary objections and excluded Tran's declaration, we review the court's ruling for abuse of discretion. In evaluating the court's ruling, we take guidance from cases analyzing the sufficiency of medical experts' summary judgment declarations.

### A.     Expert Evidence Requirements

"Whenever the plaintiff claims negligence in the medical context, the plaintiff must present evidence from an expert that the defendant breached his or her duty to the plaintiff and that the breach caused the injury to the plaintiff." (*Powell*, *supra*, 151 Cal.App.4th at p. 123; *Lattimore v. Dickey* (2015) 239 Cal.App.4th 959, 968 (*Lattimore*) [the standard of care element can only be proved by expert testimony unless the conduct is within layperson's common knowledge]; *Miranda v. Bomel Construction Co., Inc.* (2010) 187 Cal.App.4th 1326, 1336 [the causation element requires " 'competent expert testimony' "].)

" 'California courts have incorporated the expert evidence requirement into their standard for summary judgment in medical malpractice cases. When a defendant moves for summary judgment and supports his motion with expert declarations that his conduct fell within the community standard of care, he is entitled to summary judgment unless the plaintiff comes forward with conflicting expert evidence.' " (*Munro v. Regents of University of California* (1989) 215 Cal.App.3d 977, 984–985.)

A party opposing a summary judgment motion may use an expert's declaration to raise a triable issue of fact "provided the requirements for admissibility are established as if the expert were testifying at trial." (*Towns v. Davidson* (2007) 147 Cal.App.4th 461, 472.) The question of whether a witness qualifies as an expert is ordinarily a matter

addressed to the sound discretion of the trial court. (*Brown v. Colm* (1974) 11 Cal.3d 639, 646–647 (*Brown*).) The trial court abuses its discretion "if the witness has disclosed sufficient knowledge of the subject to entitle his opinion to go before the jury. [Citation.] Indeed, the exclusion of the sole expert relied upon by a party because of an erroneous view of his qualifications is, in a case where expert testimony is essential, an abuse of discretion as a matter of law requiring reversal." (*Id.* at p. 647.)

In determining a witness's qualifications to render expert opinion testimony, the test is whether the witness " 'has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates.' " (*Miller v. Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689, 701, quoting Evid. Code, § 720, subd. (a).) When the witness shows sufficient knowledge of the subject to establish the witness's testimony would likely help the jury in its search for the truth, the question of the degree of the witness's knowledge goes more to the testimony's weight than its admissibility. (*Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 38, overruled on another point in *Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 543; *Jeffer, Mangels & Butler v. Glickman* (1991) 234 Cal.App.3d 1432, 1443.) When considering the declarations of the parties' experts on summary judgment, we liberally construe the declarations of the plaintiff's experts and resolve any doubts as to the propriety of granting the motion in favor of the plaintiff. (*Powell*, *supra*, 151 Cal.App.4th at pp. 125–126.)

"Qualifications other than a license to practice medicine may serve to qualify a witness to give a medical opinion." (*People v. Catlin* (2001) 26 Cal.4th 81, 131, 132.) "Nevertheless, there must be some aspect of the expert's qualifications or experience to show the expert has competencies 'beyond common experience' that bear on the relevant factual questions." (*San Antonio Regional Hospital v. Superior Court* (2024) 102 Cal.App.5th 346, 352, citing Evid. Code, § 801, subd. (a).)

"Whether a person qualifies as an expert in a particular case … depends upon the facts of the case and the witness's qualifications." (*People v. Bloyd* (1987) 43 Cal.3d 333, 357.) " '[T]he determinative issue in each case must be whether the witness has sufficient skill or experience in the field so that his testimony would be likely to assist the jury in the search for the truth.' " (*Lattimore*, *supra*, 239 Cal.App.4th at p. 969.)

### B.     Tran's Qualifications as an Expert

The trial court sustained Rashid's objection to the entirety of Tran's declaration, finding Tran:  (1) lacked the requisite experience to render an opinion on the standard of care of a critical care physician as he completed his residency in emergency medicine in June 2023 and practiced exclusively in that area; and (2) was not licensed to practice medicine at the time of the events giving rise to the lawsuit.

On the first point, California law does not require that an expert witness in a malpractice suit possess the same professional degrees or certifications held by the defendant practitioner.  Our Supreme Court long ago recognized the "unmistakable general trend … toward liberalizing the rules relating to the testimonial qualifications of medical experts." (*Brown*, *supra*, 11 Cal.3d at p. 645.)  The court explained that while "[s]ome early cases were unbending in requiring expertise as to the precise injury involved in the litigation, as, e.g., not permitting an autopsy surgeon to testify on urology [citation] … [o]ther authorities, however, have permitted variations, as, e.g., a pathologist was qualified to testify as to causes of aseptic necrosis [citation]; an expert in otolaryngology to testify regarding plastic surgery [citation]; a homeopathic physician and surgeon to testify on the degree of care required of a physician educated in the allopathic school of medicine [citation]; a pathologist and professor of pathology to testify on the subject of gynecology [citation]." (*Id.* at p. 646.)

In *Lattimore*, the plaintiff brought a wrongful death action concerning her father's death against two doctors and a hospital in which she alleged they failed to diagnose his gastrointestinal bleeding.  (*Lattimore*, *supra*, 239 Cal.App.4th at pp. 961, 964.)  The trial

court granted the doctors' summary judgment motion after finding the plaintiff's expert, who was board certified in family and emergency medicine and was the decedent's primary physician, was not competent to testify about the standard of care applicable to gastroenterologists and general surgeons. (*Id.* at pp. 965–966, 969.)

The appellate court held the trial court erred in finding the expert was not competent to offer testimony on the standard of care. (*Lattimore*, *supra*, 239 Cal.App.3d at pp. 969–970.) The appellate court explained that while the expert did not "disclose any specific training or experience as a gastroenterologist or a general surgeon, his qualifications in emergency medicine, liberally construed, suffice to demonstrate skill and experience in treating patients who may be experiencing internal bleeding or are otherwise in need of immediate treatment." (*Ibid.*) Accordingly, the appellate court concluded the expert's declaration created an issue of fact as to whether the doctors deviated from the standard of care. (*Id.* at p. 970.)

Here, Tran's May 2024 declaration and curriculum vitae show that he graduated medical school in 2019, and completed a four-year emergency medicine residency at Kern Medical Center, which is affiliated with the David Geffen School of Medicine at the University of California, Los Angeles, in June 2023. Tran passed the American Board of Emergency Medicine qualifying exam in November 2023 and was expected to take the oral exam in 2024. Tran obtained his physician's and surgeon's license in June 2022 and had been working as an urgent care physician since August 2023, and as an emergency medicine physician at two hospitals—Bakersfield Memorial Hospital and Kaiser Permanente—since November 2023 and December 2023, respectively. Tran declared that based on his education, experience, and training as an emergency medicine physician, he was familiar with the standard of care for resuscitation and critical care physicians in the community and qualified to render expert opinions on this matter.

While Tran's experience as an emergency medicine physician is not extensive and he had been a fully licensed physician since only June 2022, Tran's qualifications in

12.

emergency medicine as a resident and practicing physician, liberally construed, suffice to demonstrate skill and experience in treating patients who may be experiencing internal bleeding or are otherwise in need of immediate medical treatment. He had sufficient experience to assist the jury in determining whether the standard of care was satisfied in this case.

Rashid contends that Tran lacked practical knowledge about the treatment of critical care patients experiencing suspected internal bleeding. Our Supreme Court has stated that an expert "had basic educational and professional training as a general foundation for his testimony, but it is a practical knowledge of what is usually and customarily done by physicians under circumstances similar to those which confronted the defendant charged with malpractice that is of controlling importance in determining competency of the expert to testify to the degree of care against which the treatment given is to be measured." (*Sinz v. Owens* (1949) 33 Cal.2d 749, 753.) Our Supreme Court, however, later noted in *Brown* that occupational experience or practical knowledge is not always required in every case as a predicate to expert testimony. (*Brown*, *supra*, 11 Cal.3d at p. 643, fn. 3.) Instead, the *Brown* court recognized that "no hard and fast rule can be laid down which would be applicable in every circumstance" and the determinative issue is "whether the witness has sufficient skill or experience in the field so that his testimony would be likely to assist the jury in the search for the truth." (*Brown*, *supra*, 11 Cal.3d at p. 645.)

Here, Tran declared that through his experience and training as an emergency medicine physician, he was familiar with the standard of care for critical care physicians. Tran's practical knowledge of providing critical care to patients that may be experiencing internal bleeding was evident from his description of Michael's symptoms, which he believed showed that as of 4:30 a.m. Michael had a GI bleed and by 6:00 a.m. he was in hemorrhagic shock and hemodynamically unstable likely due to a massive GI bleed, and the CT scan was of diminished value since it was performed without contrast. Although

Tran was not a fully licensed doctor until June 2022, through his emergency medicine training that began in 2019, he would have gained experience treating patients who presented to the emergency room who were hemodynamically unstable and needed emergent medical care.

Moreover, Tran's specialized knowledge goes to the weight of his testimony not its admissibility. (See *Lattimore*, 239 Cal.App.4th at p. 970 [whether an expert's knowledge in the defendant doctors' practice areas "would be sufficient to convince a trier of fact is irrelevant at this stage of the proceedings" on summary judgment]; *Chadock v. Cohn* (1979) 96 Cal.App.3d 205, 208 ["if a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes to the weight of his testimony rather than to its admissibility"].)

On the second point, Rashid asserts a physician must have been practicing medicine as a licensed physician at the time treatment was rendered to be qualified to offer expert opinion on the standard of care. In support of this argument, Rashid relies on *Petrou v. South Coast Emergency Group* (2004) 119 Cal.App.4th 1090 (*Petrou*), a medical malpractice case in which the appellate court interpreted Health and Safety Code section 1799.110, subdivision (c) (section 1799.110(c)), to determine whether the plaintiffs' proferred expert was qualified to testify as to the standard of care.[3]

Section 1799.110(c) provides that in an action involving a claim of negligence against a physician arising out of emergency medical services provided in a general acute care hospital emergency department, " 'the court shall admit expert medical testimony only from physicians and surgeons who have had substantial professional experience within the last five years while assigned to provide emergency medical coverage in a

---

[3]     While Rashid asserts this court issued the *Petrou* decision, *Petrou* was decided by the Fourth District, Division 3. (*Petrou*, *supra*, 119 Cal.App.4th 1090.)

general acute care hospital emergency department.' "[4] (See generally, e.g., *Petrou*, *supra*, 119 Cal.App.4th at pp. 1093–1094; *Sigala v. Goldfarb* (1990) 222 Cal.App.3d 1450, 1454–1456.)

Section 1799.110(c) "is part of a larger Good Samaritan statutory enactment, the intent of which was 'to promote the provision of emergency medical care by giving dedicated emergency room physicians a measure of protection from malpractice claims.' Thus, the section requires that an expert testifying in a malpractice action as to the standard of care must be one who has 'substantial professional experience' in providing emergency medical services in an emergency room." (*Petrou*, *supra*, 119 Cal.App.4th at p. 1094, citations omitted.)

In *Petrou*, the appellate court addressed when the five-year period for determining whether the expert had the requisite substantial professional experience begins to run from the date the testimony is admitted or from the date the malpractice occurred. (*Petrou*, *supra*, 119 Cal.App.4th at p. 1094.) The parties acknowledged "the relevant standard of care in a medical malpractice case is the one existing at the time the alleged malpractice occurred." (*Ibid.*) Based on this, the appellate court found "it is logical that the section demands expert witnesses with substantial professional experience at the time of the treatment in question," and concluded the five-year period is to be measured from the date of the alleged malpractice. (*Id.* at pp. 1092, 1094.)

As Rashid concedes, section 1799.110(c) is not on its face relevant to this matter, as he was not providing emergency medical care for the hospital's emergency department. Rashid nevertheless urges us to apply the analysis in *Petrou* and find that Tran is not qualified to render an opinion concerning the standard of care because, when

---

[4] Section 1799.110(c) provides that " 'substantial professional experience' shall be determined by the custom and practice of the manner in which emergency medical coverage is provided in general acute care hospital emergency departments in the same or similar localities where the alleged negligence occurred."

the alleged malpractice occurred in June 2021, Tran was not a licensed physician and had not practiced emergency medicine for five years. Rashid reasons that since Tran lacked the requisite experience under section 1799.110(c) to offer expert medical testimony had this been an action against a physician providing emergency medical coverage, Tran lacked experience to offer an opinion in this case.

Except in cases where section 1799.110 applies, "the standard of care for physicians is the reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of the medical profession *under similar circumstances*." (*Avivi v. Centro Medico Urgente Medical Center* (2008) 159 Cal.App.4th 463, 470 (*Avivi*).) Moreover, as our Supreme Court observed in *Brown*, "[t]he unmistakable general trend … has been toward liberalizing the rules relating to the testimonial qualifications of medical experts." (*Brown*, *supra*, 11 Cal.3d at p. 645.)

In *Brown*, the trial court refused to permit a surgeon to testify as an expert on the standard of care prevailing in 1949 when the surgeon had not been admitted to practice until several years after that and his opinion was based on a study of medical literature. (*Brown*, *supra*, 11 Cal.3d at p. 641.) The Supreme Court rejected the defendant's argument that the surgeon must have occupational experience in 1949 as a predicate to testifying regarding the applicable standard of care. (*Id.* at p. 643.) The court focused its inquiry on whether the sole fact the surgeon's training and experience were acquired 10 years after the alleged malpractice rendered his opinion as to the standard of care in 1949 per se inadmissible. (*Ibid.*) The court held that "an invariable rule which would require in all cases that an expert must have acquired a personal, working knowledge of the standard of care at the precise time when the alleged malpractice occurred would be untenable." (*Id.* at p. 644.) The court concluded the surgeon's testimony was admissible as his opinion was based on his examination of all the available literature on the matter at issue and he acquired personal training and experience in the decade after 1959. (*Id.* at pp. 644, 647.)

Since this case does not involve the application of section 1799.110(c), *Brown* applies here, and Tran's testimony is admissible if he had sufficient knowledge of the care and treatment of suspected internal bleeding to entitle his opinion to go to the jury. Rashid is correct that the standard of care is measured as of June 2021. At that time, Tran had been a resident in emergency medicine for two years. He obtained his physician's and surgeon's license the following year and began working in emergency medicine a year after that. While Tran did not have extensive experience when he submitted his declaration in May 2024, he had occupational experience in emergency medicine, both as a resident and a physician, and likely experienced the treatment of patients experiencing internal bleeding. There is nothing to suggest that the standard of care changed in the three years between the alleged malpractice and when his declaration was made.

Rashid asserts this case is distinguishable from those where an unlicensed expert was allowed to testify because the doctors in those cases all had extensive experience in their areas of expertise, such as *Lattimore*, *supra*, 239 Cal.App.4th at page 970, *Avivi*, *supra*, 159 Cal.App.4th at page 471, and *Chadock v. Cohn*, *supra*, 96 Cal.App.3d at page 209. Even so, " 'each case must be judged on its own facts.' " (*Brown*, *supra*, 11 Cal.3d at p. 645.) As we have explained, Tran had sufficient skill or experience in the field so his testimony would likely assist the jury in the search for the truth.

Rashid urges us to put up guardrails to avoid absurd results. We fail to see how the results here are absurd. Where a witness is permitted to testify because the threshold test of general testimonial qualification has been met, the witness "is subject to as penetrating a cross-examination as the ingenuity and intellect of opposing counsel can devise," which "may challenge not only the knowledge of the witness on the specific subject at issue, but also the reasons for his opinion and his evaluation of any written material upon which he relied in preparation for his testimony." (*Brown*, *supra*, 11 Cal.3d at p. 646.) Moreover, a defendant may argue the witness' testimony is not entitled to acceptance or credibility because he is not personally acquainted with the

17.

subject when the alleged negligence occurred and may produce his own witnesses in rebuttal. (*Ibid.*) "These measures are more than adequate to protect a defendant's interests." (*Ibid.*)

As we have stated, although the trial court exercises its discretion in deciding the qualification of an expert witness, "the court abuses its discretion by denying qualification if the witness has demonstrated sufficient knowledge of the subject to entitle his or her opinion to go before the jury." (*Avivi*, *supra*, 159 Cal.App.4th at p. 472, citing *Brown*, *supra*, 11 Cal.3d at pp. 646–647.) Where a party's sole expert is excluded because of an erroneous view of the expert's qualifications in a case where expert testimony is essential, discretion is abused and reversal is required. (*Avivi*, at p. 472, citing *Brown*, at p. 647.) Because Tran demonstrated sufficient knowledge of the standard of care on the treatment of internal bleeding to entitle his opinion to go before the jury, the trial court improperly excluded his declaration in deciding whether Debbie presented a triable issue of material fact. Because the court's grant of summary judgment rested on the exclusion of Tran's declaration, summary judgment was inappropriate.

## DISPOSITION

The judgment is reversed and remanded to the trial court with directions to deny Rashid's summary judgment motion. Appellant is to recover her costs on appeal.


                                                      DE SANTOS, J.

WE CONCUR:


HILL, P. J.


PEÑA, J.


18.